(No. 39569.—

Mary Li Petri, Admx., Appellee, *vs.* Turner Construction Co. *et al.*, Appellants.

*Opinion filed Jan. 19, 1967.—Rehearing denied Mar. 27, 1967.*

KLUCZYNSKI, J., took no part.

VOGEL & VOGEL, of Chicago, (L. H. VOGEL, ROBERT C. VOGEL, and RICHARD A. WALKOVETS, of counsel,) for appellant Turner Construction Company.

HINSHAW, CULBERTSON, MOELMANN & HOBAN, of Chicago, (LEONEL I. HATCH, D. KENDALL GRIFFITH, and DENNIS J. HORAN, of counsel,) for appellant Fischbach, Moore & Morrissey, Inc.

PHILIP H. CORBOY, THOMAS J. KARACIC, and WILLIAM J. HARTE, all of Chicago, for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

A jury in the circuit court of Cook County returned a verdict in the amount of $70,000 in favor of Mary Li Petri, widow of Sam Li Petri, and against Turner Construction Company and Fischbach, Moore & Morrissey, Inc., for the

death of her husband caused by defendants' violation of the Structural Work Act. (Ill. Rev. Stat. 1955, chap. 48, pars. 60-69.) The court entered a judgment on the verdict and defendants have appealed directly to this court because a constitutional question is involved.

Sam Li Petri was fatally injured on the morning of June 7, 1957, while using a material hoist at the Inland Steel Building which was under construction at Dearborn and Monroe streets in Chicago. Turner Construction Company was the general contractor and it subcontracted the lathing, plastering and acoustical ceiling work to McNulty Brothers Co., Li Petri's employer. The hoists for use in the erection of the building were leased by Turner from the Thomas Hoist Company. Fischbach, Moore & Morrissey, Inc., was the electrical subcontractor and installed the electrical components and signal system for the hoist. Prior to trial, defendant Inland Steel Company was dismissed and at the close of plaintiff's case, the motion of Thomas Hoist Company for a directed verdict was sustained.

Both Turner and Fischbach argue that the monetary limitation of the injuries statute, commonly called the Wrongful Death Act, (Ill. Rev. Stat. 1955, chap. 70, pars. 1 and 2,) should be applied to the cause of action created under section 9 of the Illinois Structural Work Act, commonly called the Scaffold Act. (Ill. Rev. Stat. 1955, chap. 48, pars. 60-69.) This act provides in part:

"For any injury to person or property occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life * * * a right of action shall accrue * * *, for a like recovery of damages for the injuries sustained by reason of such loss of life * * *."

The Wrongful Death Act provides in part:

"§ 1. Whenever the death of a person shall be caused

by wrongful act, neglect or default * * * the person * * * or company or corporation * * * shall be liable to an action for damages * * *.

"§ 2. * * * in every such action the jury may give such damages as they shall deem a fair and just compensation * * * not exceeding $25,000 where such death occurred on or after the effective date of this amendatory act of 1955."

Fischbach's theory that the monetary limitation of the Wrongful Death Act should be applied to section 9 of the Scaffold Act has surface appeal and is essentially as follows. At common law there was no cause of action for wrongful death and there is no such action today except as provided by the legislature. (*Hall* v. *Gillins,* 13 Ill.2d 26.) In 1853 the legislature by a general statute, the Wrongful Death Act, created a cause of action for a death caused by wrongful act, neglect or default and limited the amount of recovery to $5000 (Laws of 1853, p. 97); and while it has from time to time increased the amount recoverable under the act, $10,000 in 1903 (Laws of 1903, p. 217); $15,000 in 1947 (Laws of 1947, p. 1094); $20,000 in 1951 (Laws of 1951, p. 393); $25,000 in 1955 (Laws of 1955, p. 2006) and $30,000 in 1957 (Laws of 1957, p. 1939), it has consistently affirmed its intention to limit the recovery. The legislature also enacted several statutes after 1853 in which a recovery for death was allowed as a part of the statute's over-all scheme to regulate a particular subject matter. (See, *e.g.,* Dram Shop Act (Laws 1871-72, p. 552); Mines and Mining Act (Laws 1899, p. 300); Structural Work Act (Laws 1907, p. 312).) Fischbach contends that the general provisions of the Wrongful Death Act are to be applied to all death actions, including those created under special statutes such as the Dram Shop Act, the Coal Mining Act and Scaffold Act except where the special statute provides otherwise. It asserts that the $20,000 limitation of the Dram Shop Act (Ill. Rev. Stat. 1955, chap. 43, par. 135)

and the $20,000 limitation of the Coal Mining Act (Ill. Rev. Stat. 1955, chap. 93, par. 10.07) are necessary because they are different from that allowed under the general provisions of the Wrongful Death Act and that when no limitation on damages for death is provided in the special statute, as in the Scaffold Act, the limitation of the Wrongful Death Act is to be applied.

Turner's argument on this point is essentially the same as Fischbach's. It asserts that the Wrongful Death Act, the Scaffold Act and the Coal Mining Act are *in pari materia,* that the public policy in this State is that there be a limitation of recovery for wrongful death and that if the limitation on recovery of the Wrongful Death Act is not applied to the recovery for death under the Scaffold Act, "absurd consequences ensue."

The fallacy of defendants' theory is that the legislature *has expressly limited* the amount recoverable for death in the special statutes, although the limitation of recovery under the Wrongful Death Act was the same. In fact, the amount of the limitation in each of the special acts was apparently taken from the amount recoverable under the Wrongful Death Act at the time the limitation was placed in the special act. For example, a $5000 limitation was added to the Mines and Miners Act in 1887 (Laws 1887, p. 235) when recovery under the Wrongful Death Act was limited to $5,000; a $10,000 limitation was contained in the Occupational Diseases Act passed in 1911 (Laws 1911, p. 334) when recovery under the Wrongful Death Act was limited to $10,000; and a limitation of $15,000 was added to the Dram Shop Act in 1949 (Laws 1949, p. 816) when recovery under the Wrongful Death Act was limited to $15,000. In sharp contrast, the Scaffold Act has never contained a limitation on the amount recoverable for death under the act.

Attempts to read the monetary limitation of the Wrongful Death Act into another statute also providing a death re-

covery are not new. In *O'Connor* v. *Rathje,* 368 Ill. 83, the defendants argued that the Dram Shop Act, which contained no limitation as to the amount of recovery for death at that time, was in conflict with the Wrongful Death Act which limited recovery to $10,000. This contention was rejected on the ground that the two acts are separate and distinct. In *Knierim* v. *Izzo,* 22 Ill.2d 73, the plaintiff tried to maintain an action against tavern operators and owners of tavern premises under the Wrongful Death Act where the limitation on recovery had been raised to $30,000 rather than under the Dram Shop Act which had been amended and recovery limited to $20,000. We stated in *Knierim* "* * * that the two acts are separate and distinct and that the nature and amount of damages provided for in the Liquor Control Act are not to be limited * * * or expanded * * * by the provisions of the Wrongful Death Act." 22 Ill.2d 73, 79.

While no case has heretofore reached this court where it has been argued that the limitation on recovery in the Wrongful Death Act should be applied to a recovery for death under the Scaffold Act, the issue was raised and decided in *Mitseff* v. *Acme Steel Company,* (N.D. Ill. 1962), 208 F. Supp. 805. The court analyzed the language used in providing a cause of action for death under the Mines and Mining Act and that used in the Scaffold Act and concluded, "The only reasonable inference is that the Scaffolding Act was copied from the Mines and Miners Act but that the limitation on the amount of recovery contained in the earlier law [Mines and Mining Act] was omitted. This omission must be presumed to have been intended." (208 F. Supp. 805, 807.) Furthermore, while the precise point was not passed upon, the case of *Thomas* v. *Carroll Construction Co.* 14 Ill. App. 2d 205, suggests that a complaint with an *ad damnum* of $40,000 for death action under the Scaffold Act would be proper.

The historical background of the Wrongful Death Act

and all the other acts in which a cause of action for death is created, indicates to us that the legislature has specifically provided in each act the maximum amount to be recovered for death and the limitation in the Wrongful Death Act is not to be applied to any of these other acts. The legislature must be aware that we have refused to apply the limitation on recovery under the Wrongful Death Act to the Dram Shop Act and that a Federal district court has refused to apply the limitation to the Scaffold Act. We hold that the monetary limitation of the Wrongful Death Act should not be applied to the cause of action created under section 9 of the Scaffold Act.

Turner and Fischbach both contend that the failure to apply the monetary limitation of the Wrongful Death Act to section 9 of the Scaffold Act violates the equal-protection clause of the fourteenth amendment to the constitution of the United States and section 22 of article IV of the Illinois constitution prohibiting special legislation. It is argued that defendants sued under the Wrongful Death Act, who have caused a death by wrongful act, neglect or default, are protected by the monetary limitation on recovery in that act, while defendants sued under the Scaffold Act, who have caused a death by wilful violation of the act, are not protected by such a monetary limitation, and that there is no reasonable basis for treating defendants under the two acts differently.

Defendants concede that the Scaffold Act represents an exercise of the police power designed to minimize the risk of injury or death in a hazardous industry. Turner argues, nevertheless, that there is no reasonable basis to impose unlimited liability upon the construction industry when it is not imposed upon other dangerous industries. To support its assertion that there are other dangerous industries, Turner has reproduced in its brief Tables 3 and 4 of Part I of the 1957 edition of "Annual Report on Compensable Work Injuries" prepared and published by

the Illinois Department of Labor, Division of Statistics and Research. Table 3 shows the trend of compensable work injury rates in Illinois by industry from 1945 through 1957 and Table 4 among other things shows the number of fatal injuries per 100,000 workers by industry in Illinois. Turner points out that in 1957 when Li Petri was killed, there were 163 injuries per 1,000 workers engaged in coal mining, 89 injuries per 1,000 workers engaged in other mining, quarrying, and petroleum production, 32 injuries per 1,000 workers in contract construction and 24 injuries per 1000 workers in transportation. For the same year there were 132.9 fatal injuries per 100,000 workers in mining, quarrying and petroleum production, 41.4 fatal injuries per 100,000 workers in lumber and wood producers, 37.9 fatal injuries per 100,000 workers in contract construction and 32.7 fatal injuries per 100,000 workers in electric power, gas and water producers. Fischbach argues that two of the most dangerous activities, the operation of motor vehicles and airplanes, are highly regulated, but the people who engage in these activities in Illinois receive the benefit of the monetary limitation of the Wrongful Death Act if they kill someone by their wrongful act, neglect or default.

Conceding *arguendo* that the recovery for a death caused by a wrongful act, neglect or default under the Wrongful Death Act should be the same as a recovery for a death caused by wilful violation of the Scaffold Act, we are faced with the question of whether the unlimited recovery of the Scaffold Act is unfair to defendants under that act or whether the monetary limitation of the Wrongful Death Act is unfair to a plaintiff under the latter act. It would seem that a plaintiff under the Wrongful Death Act is in a better position to argue that the only limit on his recovery should be that shown by the evidence, than a defendant under the Scaffold Act saying he should not be liable for the injuries shown by the evidence because a de-

fendant under the Wrongful Death Act does not have such liability.

In *Hall* v. *Gillins,* 13 Ill.2d 26, it was argued that we should recognize a common-law cause of action for wrongful death because the Wrongful Death Act does not provide a complete and adequate remedy. The legislature's power under the constitution to fix a maximum recovery was recognized, but we did go on to consider the adequacy of the legislative remedy. In considering whether the maximum recovery fixed in the Wrongful Death Act warranted us in recognizing a common-law wrongful death action, we said: "It is here that the plaintiffs' argument presses most strongly upon us, for in most of the States there is no arbitrary limit upon the amount recoverable in a wrongful death action, and it is common knowledge that larger damages are often recovered for injuries than are permitted under our statute when the same wrongful conduct of the defendant has resulted in death. On the other hand, the adequacy of the monetary limit has been a source of constant legislative concern, particularly in recent years * * *.

"Under these circumstances we are of the opinion that the differences between the action sought to be maintained and the action that is available under the statute are not sufficiently significant to warrant us in recognizing a new remedy. The point of greatest concern has been the subject of frequent legislative attention. Further legislative action appears likely, and the likelihood of legislative action has always militated against judicial change." (13 Ill.2d 26, 31-32.) *Hall* v. *Gillins* was decided in January, 1958, about six months after the legislature had raised the maximum recovery from $25,000 to $30,000. The maximum recovery is still $30,000.

Plaintiff has attached an appendix to her brief which shows that only 12 States presently have a maximum limit of recovery in their wrongful death statutes. Only one

State limits recovery to $20,000 (South Dakota); four have a limit of $25,000 (Colorado, Kansas, Missouri and Oregon); two have a limit of $30,000 (Illinois and Massachusetts); three have a limit of $35,000 (Minnesota, Virginia and Wisconsin); New Hampshire has a $40,000 limit; and West Virginia has a $100,000 limit. The remaining States have either refused to impose a monetary limitation or abolished it by amendatory act. The appendix shows that there has been a trend to raise the limit or abolish it between 1955 and 1965 in those States which had a limit, and plaintiff suggests this reflects a legislative re-evaluation of death actions in light of socio-economic changes.

We hold that defendants have failed to show that the verdict of $70,000 (which they do not contend is not supported by the evidence) is unreasonably discriminatory against them and they have not, therefore, proved they have been denied equal protection of the law. The maximum recovery of the Wrongful Death Act, if it be special legislation, has not been shown to have injured them and they have no standing to complain of its existence.

Fischbach also argues that the Scaffold Act contains a subject not expressed in the title of the act and this violates section 13 of article IV of the Illinois constitution. The Scaffold Act is entitled "An Act providing for the protection and safety of persons in and about the construction, repairing, alteration, or removal of buildings, bridges, viaducts, and other structures, and to provide for the enforcement thereof." It is asserted that there is nothing in the title of the act to apprise either the legislators or the general public that the last paragraph of section 9 of the act creates a civil cause of action for injury or death caused by a wilful violation of the act.

In *Labanoski* v. *Hoyt Metal Co.* 292 Ill. 218, it was argued that the title of the Occupational Diseases Act of 1911 fails to apprise the legislators or the general public that section 15 of the act created a civil remedy for wilful

violation of the act. The language creating the civil remedy under the Occupational Diseases Act was almost identical to that used in the last paragraph of section 9 of the Scaffold Act. Laws 1911, p. 335.

In *Labanoski,* this court stated "The contention that section 15 is unconstitutional because it embraces a subject not referred to in the title of the act is untenable. Section 14 of the act provides penalties for its violation. Section 15 gives a right of action to any employee injured in health by wilful failure of the employer to comply with any of the provisions of the act. The argument is that the subject of section 15 is foreign to the title of the act. We think this a misapprehension. The purpose of the act, as expressed in its title, is 'to promote the public health by protecting certain employees in the State from the dangers of occupational diseases, and providing for the enforcement thereof.' Section 15 is as germane to and as much a part of the means provided for the enforcement of the act as the penalty section. The title to our Child Labor act states its purpose to be, 'to regulate the employment of children in the State of Illinois and to provide for the enforcement thereof.' It provides a penalty for its violation but contains no express provision authorizing an action for damages. It was held in *Strafford* v. *Republic Iron and Steel Co.* 238 Ill. 371, and *Beauchamp* v. *Sturges & Burn Manf. Co.* 250 *id.* 303, that a liability for damages resulting for violation of the act was created whether expressly so declared in the statute or not, and that such a construction did not render the act, or any part of it, obnoxious to the provision of the constitution that no act shall embrace more than one subject and that shall be expressed in the title. That provision of our constitution permits including in an act any means reasonably adapted to secure the object indicated by the title." 292 Ill. 218, 222-223.

We hold that the civil remedy created in the last paragraph of section 9 of the Scaffold Act is sufficiently ex-

pressed in the title of the act. *Labanoski* v. *Hoyt Metal Co.* 292 Ill. 218.

Defendant Fischbach next argues that it was entitled to a directed verdict because there was no evidence that it had charge of the construction operations involving the violation or that it violated the act or that a violation of the act was the proximate cause of Li Petri's death.

The record shows that two temporary hoists were installed for use during construction of the Inland Steel Building, a material hoist and a passenger hoist for the workmen. The material hoist was an unenclosed platform within a tubular steel shaft. The elevator shaft had one gate, about 5 feet in height, for each floor of the building, except the first floor, which had a gate on both the west and east sides of the shaft.

The material hoist was operated by a hoisting engineer, an employee of Turner, from an enclosed shanty in the basement. The operating enclosure contained a board with red lights on it, one light for each floor of the building. Each gate had a plunger switch which was activated when the gate was raised. When any gate on the material hoist shaft was up, a corresponding red bulb would light on the operator's board or console indicating to the operator upon what floor a gate was raised. The light for the first floor would go on when either of the two first floor gates was up. Only when all the gates were down would all the lights be out and only when all lights were out would the operator move the material hoist.

There was a two-way radio between the passenger hoist and the operator in the basement. The conductor or signal man, also an employee of Turner, rode the passenger elevator and used the radio to inform the operator between which floors the material hoist should be operated.

About 7:30 A.M. on June 7, 1957, Li Petri requested and received permission from the conductor to use the material hoist to take some long material (channel iron

used in plastering) to the fourth floor. The conductor radioed to the operator that the material hoist would be operated between the basement and fourth floors using the first and fourth floor lights.

The procedure for loading the long channel irons was to have the material hoist placed in the basement. Li Petri would then open the gate at the first floor, pin it so it remained open and climb on the I-beam on the top of the cage. His helper would pass the channel iron through the opened gate to him and he would lower one end to the floor of the cage and lash the other end to the cable of the hoist overhead. He would then climb off the cage through the open gate, close the gate, the red light would go off the operator's board and the operator would raise the hoist to the desired floor.

When Li Petri received permission to use the material hoist, the gate on the first floor was closed. He sent his helper to get the channel iron. The helper had his back to the hoist when he heard a scream. He hurried back and saw Li Petri caught between the hoist and the shaft. The gate was pinned open at this time.

The hoist operator said he looked at the control board, he saw no light on, he started the hoist and then he heard a man scream. He stopped the hoist and kept the brake applied for 15 minutes so the hoist would not move. During all this time he never saw the light on.

An electrician employed by Fischbach made a routine daily check on the hoist signal system. He was ten minutes late for work that morning and had not checked the system before it was used. He examined the control board within ten minutes after the accident and found no bulb lit on the console. He checked the bulbs, fuses, switches and plungers and found nothing wrong. No repairs were made to the signal system and the material hoist was used the remainder of the day.

There is evidence in the record to show that the gate

on the first floor was open and the signal light was out. This could indicate improper maintenance of the signal system by Fischbach. We hold that it was proper to permit the jury to pass on the issue and its verdict was not against the manifest weight of the evidence.

Fischbach also argues that it was error to refuse defendants' instruction No. 7. The instruction told the jury that defendants have alleged an affirmative defense that the sole proximate cause of the accident was the conduct of decedent and directed the jury to find for defendants if the evidence showed "the death resulted solely from the conduct of the decedent and was not due to any wilful violation of the Structural Work Act of either or both defendants."

The jury was instructed that plaintiff had the burden of proving both a violation of the Scaffold Act and that the violation was the proximate cause of the fatal injury; that if either of those propositions was not proved, the jury should find for the defendants; and that defendants deny they violated the Scaffold Act and deny any act or omission on their part was a proximate cause of the death. The essence of defendants' instruction No. 7 would have been repetitious of the instructions given. The trial court did not err in refusing to give defendants' instruction No. 7.

Turner argues that the trial court erred in directing a verdict in favor of Fischbach on its cross-complaint against Fischbach for indemnification. The pertinent part of the indemnification clause of the contract between Fischbach and Turner provides that Fischbach "assumes entire responsibility and liability in and for any and all damage * * * growing out of or resulting from the execution of the work provided for in this Contract or occurring in connection therewith, and agrees to indemnify * * * Turner * * * against any and all loss * * * occuring in connection with * * * the use by the Subcontractor * * * of any * * * hoists * * * rented * * * to Turner * * *."

The uncontradicted evidence is that the work under the subcontract was for the permanent installation in the base building and did not cover maintenance of the signal system on the material hoist. But Turner argues that maintenance was brought under the contract terms by change order and that the signal system was to be maintained pursuant to change order. The change-order article of the contract provided that no alterations were to be made "except upon the written order of Turner, and when so made the value of the work to be added or omitted shall be stated in said order, and the amount added to or deducted from the contract price." Over objection, George Morrison, chief purchasing agent of Turner, testified there was a change order for maintenance of the electrical system. His testimony developed that there were a number of change orders, each for temporary work done "for a certain month or a certain period" and that he prepared them after the work was done from information sent from the job to him. He did not produce any such change order and said that while change orders were in the company's contract files he could not identify them. The best evidence of the contents of the change order was the order itself and that was not produced.

On the basis of the record before us, we conclude that the occurrence did not grow out of, result from or occur in connection with any work of Fischbach provided for in the subcontract containing the indemnification clause. Although the accident may have arisen in part from work performed by Fischbach on the material hoist, this work was not provided for in the subcontract. Of course, Turner incurred no liability from Fischbach's use of the hoist because Fischbach was not using the hoist.

Turner states that it is entitled to indemnification if the subcontractor is on the job at the time of the occurrence and the occurrence is connected with the subcontractor's work. The short answer to this is that the indemnification

clause does not so provide, and it is not argued that any right of implied indemnification exists. We hold that the trial court properly directed a verdict in favor of Fischbach on Turner's cross-complaint for indemnification.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. Justice KLUCZYNSKI took no part in the consideration or decision of this case.