(No. 76360

DAVID R. PASQUALE, Adm'r of the Estate of Diane K. Pasquale, Deceased, for the Benefit of Samantha Pasquale, Appellant, v. SPEED PRODUCTS ENGINEERING *et al.* (F&B Manufacturing Company, Appellee).

*Opinion filed August 10, 1995.*

McMORROW, J., joined by HARRISON, J., dissenting.

Leonard M. Ring & Associates, P.C. (William J. Jovan, Leonard M. Ring and Leslie J. Rosen, of counsel), and Paul P. Biebel, Jr., of Altheimer & Gray, all of Chicago, for appellant.

John W. Bell and Charles P. Rantis, of Johnson & Bell, Ltd., of Chicago (Thomas H. Fegan and Mindy Kallus, of counsel), for appellee.

Womick & Associates, Chtd., of Carbondale (John P. Womick, of counsel), for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, David R. Pasquale, as administrator of Diane K. Pasquale's estate, brought a wrongful-death action against Great Lakes Dragway and Speed Products Engineering in the circuit court of Cook County for the benefit of Samantha Pasquale, the surviving next of kin, and himself (David), the surviving spouse. Wesley Law, acting as the special administrator of the estate of Raymond Law, deceased, joined in bringing the action as co-plaintiff. Prior to trial, plaintiff settled with Great Lakes Dragway (Great Lakes) in the valued amount of $861,789. The case proceeded to trial on plaintiff's fourth-amended complaint and on cross-claims for contribution by the two remaining defendants. The complaint alleged, *inter alia*, a wrongful-death action sound-

ing in strict liability against joint tortfeasors Speed Products Engineering (Speed) and F&B Manufacturing Company (F&B) in benefit of Samantha (count I), and a separate wrongful-death action sounding in strict liability against Speed alone in benefit of David (count II). After the parties rested, the trial court refused to instruct the jury on a separate claim by plaintiff, as an individual, against Speed, seeking recovery for emotional distress based on a theory of strict liability (count III). The refusal, in effect, granted Speed a directed verdict on that count.

Jury verdict of $1.5 million was subsequently returned against Speed and F&B for the benefit of Samantha, and a separate jury verdict of $150,000 was returned against Speed for the benefit of David. The trial court entered two judgments, *nunc pro tunc*, on the two verdicts.

During post-trial proceedings, the court denied F&B's motion for judgment notwithstanding the verdict in favor of Samantha, but granted its request for a setoff of the settlement amount. The trial court directed a setoff of $430,894.50 against the judgment in benefit of Samantha. The trial court additionally denied plaintiff's motion for a new trial on damages and reinstatement of count III.

F&B subsequently appealed the trial court's denial of the motion for judgment notwithstanding the verdict as well as the setoff application. Plaintiff, as administrator and individually, cross-appealed the sufficiency of the damages and the grant of directed verdict in favor of Speed. The appellate court affirmed the trial court's rulings, with the exception of the ruling applying the setoff. The appellate court determined that the trial court should have entered one wrongful-death judgment on the two separate verdicts for Samantha and David, and then applied a setoff of $861,789, the full amount of

the Great Lakes settlement, against that portion of the judgment, $1.5 million, for which F&B and Speed were jointly and severally liable. The appellate court reversed and remanded with directions to that effect. (252 Ill. App. 3d 724.) Presiding Justice Jiganti dissented, regarding the directed setoff application. Plaintiff's petition for a rehearing and alternative request for certificate of importance were later denied.

We granted plaintiff's petition for leave to appeal (145 Ill. 2d R. 315), allowed F&B's request for cross-relief (145 Ill. 2d R. 315(g)), and permitted the filing of an *amicus curiae* brief in support of plaintiff (134 Ill. 2d R. 345(a)). For reasons which follow, we now affirm the judgment of the trial court in directing a verdict in Speed's favor on plaintiff's individual action for emotional distress and denying F&B's motion for judgment notwithstanding the verdict in benefit of Samantha. We also affirm that part of the trial court's judgment granting a setoff of $430,894.50 against the judgment in Samantha's benefit.

## ISSUES

The issues on appeal are whether the trial court erred by (1) allowing directed verdict in favor of Speed on David's claim for emotional distress brought under a theory of strict liability; (2) denying F&B's motion for judgment notwithstanding the verdict; and (3) allocating the wrongful-death settlement to the claims of individual beneficiaries and applying setoffs against those beneficiaries' individual recoveries.

## FACTUAL BACKGROUND

On May 27, 1979, Burgess Clayton Harris, a professional race car driver, was driving his top fuel race car at Great Lakes Dragway when an unknown failure in the car's driveline caused the engine's speed to greatly accelerate. As the engine's speed accelerated, the clutch

assembly's rotations also accelerated to the point where the assembly flew completely apart. The intact clutch parts burst out of a bellhousing or containment device in which they were enclosed and flew through the air into the crowd of spectators. One of the clutch parts struck Diane Pasquale in the head, killing her. David Pasquale, Diane's husband, was seated next to her at the time.

Evidence at trial would later reveal that the drive-line failure did not cause the accident; such failures happen with frequency due to the amount of power produced by race car engines. Expert testimony was also presented that the accident was caused by the bell-housing's failure to contain the clutch parts. Undisputed expert testimony was presented that steel used in the bellhousing, when tested, yielded a low level of tensile and impact strength, meaning that the material was very brittle. Furthermore, the type of fractures to the container's surface also indicated that the material was brittle. The material did not meet specifications established by the Speed Equipment Manufacturer's Association, an organization which has developed performance specifications and testing procedures for race car parts in order to provide greater safety for drivers and spectators.

The chassis of Harris' car was built by Peek Brothers (Peek), which purchased the bellhousing from Speed on January 12, 1978. Speed was a well-known distributor of race car parts. Speed's owner at the time of the accident was David Russell. Speed did not manufacture any of the parts it sold; it merely operated out of a single room and employed only two non-highly technically skilled employees. Peek ordered the bellhousing or "high gear can" from Speed's catalogue.

Roy Fjastad, the prior owner of Speed, originally contracted with F&B to manufacture the cans. Russell

subsequently acquired the company, but continued the practice of ordering the .cans from F&B in the same manner as Fjastad. F&B, at the time of trial, was the largest hydroforming company in the world. Hydroforming is the process by which a flat metal plate is stretched to form a desired shape through the use of a die and a diaphragm which exerts pressure on the metal causing it to stretch. F&B was engaged in the manufacture and assembly of certain products, including, but not limited to, designing, engineering and testing. F&B represented itself in at least one trade journal as capable of providing complete technical engineering and development services with over 20 years' experience.

This opinion will present additional facts as the discussion warrants.

## DISCUSSION

### I

#### David's Claim for Emotional Distress Based on Theory of Strict Liability

Count III of the fourth-amended complaint was an action by David, as an individual, solely against Speed, and sought damages for emotional distress under a theory of strict products liability. Count III alleged:

> "As a proximate result of DIANE K. PASQUALE being struck with great force by one of said clutch parts her bone marrow, blood, and brain matter did strike Plaintiff DAVID R. PASQUALE with great force on his face and other parts of his body causing marks which remained for several weeks. As a proximate result of said impact and occurrence Plaintiff experienced and will experience severe suffering, mental anguish and emotional distress, lost and will lose great earnings and profits, had [sic] has expended and will expend great expenses for medical care and treatment."

Speed subsequently filed a motion for summary judgment which was granted by the trial court. The trial

court ruled that damages for emotional distress were not recoverable under a strict products liability theory.

At trial, evidence established that David and Diane were in the stands at Great Lakes Dragway watching the auto race. David testified that when a race car took off, he heard a noise. Then something which felt like a handful of sand hit the side of his face. David looked over at Diane and saw that she was sitting upright, but was falling over towards him. According to David, Diane's brains and blood were "all over the place." The entire interior of Diane's head, including the backs of her eyeballs, was exposed to David's sight. After he placed the top of Diane's head back in place, he felt her face for a while, then picked her up and carried her down the stands to a waiting ambulance. David then became sick and went into shock. David was aware that Diane was dead as he carried her.

David testified that after Diane's death, he became a "basket case." He could not work, lost weight, was eventually fired from his job and had a difficult time finding work later. He also testified that he was "miserable, lonely and depressed" and still suffered bad dreams by the time of trial.

At the close of the evidence, the trial court denied plaintiff's request for a jury instruction on David's individual claim for emotional distress, thereby granting Speed, in effect, a directed verdict on count III. Plaintiff cross-appealed from that ruling. The appellate court affirmed on the basis that this court's decision in *Woodill v. Parke-Davis & Co.* (1980), 79 Ill. 2d 26, foreclosed consideration on the merits.

On appeal, F&B responds in support of affirming the trial court's ruling because Speed, the only defendant named in count III, is now in bankruptcy and has not appeared or filed a brief. This court denied F&B's motion to dismiss this issue from the appeal on the basis of

mootness. F&B now responds to avoid any potential prejudice to itself.

Plaintiff acknowledges that *Woodill* refused to recognize a cause of action in strict products liability for emotional distress and mental anguish. Plaintiff contends, however, that *Woodill* was based on then-existing law which limited recovery for emotional distress injury to instances of intentionally tortious conduct. (See *Knierim v. Izzo* (1961), 22 Ill. 2d 73.) Plaintiff argues that this limitation of "nonimpact cases" to the area of intentional tort liability was subsequently extinguished in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, and now such a recovery is permitted in negligence cases. Plaintiff argues that because the requirement of a contemporaneous physical injury or impact was extinguished in *Rickey* and formed the limiting concept in *Woodill*, there is no longer good reason to deny recovery for emotional distress based on strict products liability. (See *Woodill v. Parke Davis & Co.* (1978), 58 Ill. App. 3d 349, 355 (relying on "physical harm" requirement in section 402A of the Restatement (Second) of Torts (1965)).) Plaintiff characterizes *Rickey* as emphasizing the element of foreseeability in negligence actions, and notes that foreseeability is also a "cornerstone" of liability based on strict liability theory.

Defendant responds by correctly pointing out that plaintiff refers to himself as a "bystander," as was the plaintiff in *Rickey*. Defendant argues that plaintiff may not benefit from any potential expansion of *Rickey* because he did not, in the first instance, sufficiently plead or prove himself to have been a bystander.

Plaintiff, however, does not limit his *arguments* for allowing recovery for emotional distress under strict products liability theory to instances of bystanders. Plaintiff claims that he was both a direct victim of defendant's conduct as well as a bystander who wit-

nessed its effects upon another. (See *Jarka v. Yellow Cab Co.* (1994), 265 Ill. App. 3d 366.) Thus, according to plaintiff, the relevant inquiry is whether the absence of a contemporaneous impact or injury requirement for emotional distress recovery in negligence actions, for either direct victims or bystanders (*Rickey*, 98 Ill. 2d at 550, 554-55), means the allowance of an emotional distress recovery based on strict products liability. The parties thus initially dispute the relevant inquiry here.

We believe that plaintiff's arguments for extending strict liability are broad and not logically dependent on whether he was a direct victim or a bystander. Nor does his argument for expanding strict liability depend solely on *Rickey*. Although not cited by plaintiff, and decided after *Rickey*, *Corgan v. Muehling* (1991), 143 Ill. 2d 296, eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress on a theory of negligence. The rule plaintiff challenges is the requirement of a "physical harm" for recovery under strict liability (Restatement (Second) of Torts § 402A (1965)); his status as either a direct victim or bystander is immaterial to that broad challenge.

Nonetheless, it is clear that David's proofs at trial showed him to be a bystander and not a direct victim as that distinction is recognized under Illinois law. (See *Rickey*, 98 Ill. 2d 546 (bystander case); *Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230 (bystander case); *cf. Corgan v. Muehling*, 143 Ill. 2d 296 (direct victim case).) In *Rickey* and *Siemieniec*, the plaintiffs' alleged emotional distress resulted from their having witnessed or observed the physically harmful effects of the defendant's negligence on a close relative. In *Corgan*, the plaintiff's emotional distress was the direct consequence of the defendant's negligent conduct; the plaintiff's emotional distress did not result from injury to another.

David's evidence here did not show that he suffered emotional distress as an independent or direct consequence of the failure of F&B's bellhousing. There was no evidence that he greatly feared for his safety beyond that experienced as a result of his wife's accident. We conclude that this case represents a bystander case, despite David's arguments urging expansion beyond these facts. Thus, we confine our inquiry to whether the elimination of the contemporaneous injury or impact requirement for bystander recovery for emotional distress in the area of negligence meaningfully translates into an elimination of the element of physical harm for a bystander's recovery for emotional distress under strict liability theory.

In *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, strict lability for unreasonably dangerous products was established as Illinois law, and the court adopted section 402A of the Restatement (Second) of Torts. In *Woodill*, this court agreed with and adopted the appellate court's decision that "strict liability should not be extended to include recovery for [a] plaintiff['s] emotional distress and mental anguish." (*Woodill*, 79 Ill. 2d at 38.) The appellate court reached its decision by relying on section 402A of the Restatement (Second) of Torts, which provides that " '[o]ne who sells any product in a defective condition unreasonably dangerous to user or consumer or to his property is subject to liability for *physical harm* thereby caused to the ultimate user or consumer ***.' " (Emphasis in original.) (See *Woodill*, 58 Ill. App. 3d at 355, quoting Restatement (Second) of Torts § 402A(1) (1965).) The appellate decision additionally recognized that, in Illinois, recovery for emotional distress had been traditionally limited to intentionally inflicted injury. *Knierim*, 22 Ill. 2d 73.

In *Rickey*, 98 Ill. 2d 546, this court held, in the case of a bystander, that a recovery for emotional distress

would be permitted in the case of negligent conduct without a requirement that the plaintiff show a contemporaneous injury or impact. (*Cf. Braun v. Craven* (1898), 175 Ill. 401 (establishing the impact rule).) In place of the impact rule, *Rickey* adopted the zone-of-physical-danger rule which had been applied by a majority of jurisdictions considering the matter. Under *Rickey*'s new rule, a bystander in a zone of physical danger, who reasonably feared for his own safety because of the defendant's negligence, was allowed to recover for physical injury or illness which manifested as a result of emotional distress. Although plaintiff argues otherwise, *Rickey* stated nothing regarding foreseeability.

In *Corgan*, 143 Ill. 2d 296, this court made clear that *Rickey*'s zone-of-physical-danger rule applied only to bystanders. *Corgan*, however, extended *Rickey*'s elimination of the impact rule to instances where plaintiffs were the direct victims of the negligent conduct and suffered emotional distress injury.

While *Rickey* and *Corgan* expanded recovery in the area of negligence, they did not change the law that there exists in Illinois no recovery for emotional distress under a theory of strict liability. In fact, a fair reading of *Rickey* conveys that that particular state of the law was implicitly endorsed. (See *Rickey*, 98 Ill. 2d 546.) Neither has plaintiff cited any Illinois appellate court decisions recognizing a strict liability cause of action, nor has he argued that the public interest is prejudiced by the absence of such a cause of action. Plaintiff urges only that courts in other jurisdictions allow such recovery and so should we.

With the exception of only a few cases (*Walker v. Clark Equipment Co.* (Iowa 1982), 320 N.W.2d 561; *Shepard v. Superior Court* (1977), 76 Cal. App. 3d 16, 142 Cal. Rptr. 612), the authorities cited by plaintiff appear to only concern emotional distress recovery under a

negligence theory (*In re Air Crash Disaster Near Cerritos, Cal.* (9th Cir. 1992), 967 F.2d 1421; *Pearsall v. Emhart Industries, Inc.* (E.D. Penn. 1984), 599 F. Supp. 207; *Masaki v. General Motors Corp.* (1989), 71 Haw. 1, 780 P.2d 566; *Waid v. Ford Motor Co.* (1984), 125 N.H. 640, 484 A.2d 1152); emotional distress recovery by the ultimate user or consumer of a product, rather than a bystander (*Jackson v. Johns-Mannville Sales Corp.* (5th Cir. 1986), 781 F.2d 394; *Kearney v. Phillips Industries, Inc.* (D. Conn. 1989), 708 F. Supp. 479; *Kately v. Wilkinson* (1984), 148 Cal. App. 3d 576, 195 Cal. Rptr. 902); or emotional distress recovery by a plaintiff who was a direct victim in addition to being a bystander (*Walters v. Mintec/International* (3d Cir. 1985), 758 F.2d 73).

When a rule of law has once been settled, contravening no statute or constitutional principles, such rule ought to be followed under the doctrine of *stare decisis* unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interest. (*Maki v. Frelk* (1968), 40 Ill. 2d 193; see also *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152.) While these tenets cannot be so rigid as to incapacitate a court in its duty to develop the law, we do not perceive that the needs of our society have so changed or that injustice results from the rule at issue here such that it requires reevaluation. (See *People v. Gersch* (1990), 135 Ill. 2d 384, 396; *cf. Alvis v. Ribar* (1981), 85 Ill. 2d 1, 24.) Neither do we believe that the changes wrought by *Rickey* and its progeny, *Corgan*, the elimination of the impact rule in the area of negligence, support a similar change in Illinois at this time in the area of strict liability.

As discussed by the dissent in *Shepard v. Superior Court* (1977), 76 Cal. App. 3d 16, 142 Cal. Rptr. 612, there is significant reason not to extend a recovery for emotional distress based on fault liability to the realm of strict liability:

> "[T]he fault of a defendant is an indispensable element of duty of care in an action brought for the infliction of emotional distress, and that in the absence of fault or other culpable conduct a defendant may not be rendered liable for this particular harm. To put it another way, it means that in an action instituted for causing emotional trauma, the liability of a defendant is premised plainly and directly on the presence or absence of defendant's fault. Since the doctrine of strict liability is not founded upon fault or culpable conduct, a defendant manufacturer should not be held liable under the doctrine for the special harm of inflicting emotional distress upon a plaintiff."
> (*Shepard*, 76 Cal. App. 3d at 26, 142 Cal. Rptr. at 618-19 (Kane, J., dissenting).)

Consequently, we decline to reexamine the established rule that a physical harm is required to state a bystander's cause of action and recovery based on strict liability.

Although David alternatively claimed that he "incurred a physical impact" when he was struck by his wife's body parts, causing marks on his body for several weeks, we agree that the evidence at trial did not establish that he suffered "physical harm" as that element is commonly understood. We thus conclude that the trial court did not err in refusing to instruct the jury on damages for emotional distress, thereby, in effect, directing a verdict in favor of Speed against David on count III.

## II

### Denial of Judgment for F&B Notwithstanding the Verdict in Favor of Samantha

Plaintiff's fourth-amended complaint alleged that, at the time the bellhousing left the control of F&B and Speed, it was unreasonably dangerous because it was of inadequate strength. Plaintiff alleged that the bellhousing was of inadequate strength to contain the clutch parts in that the strength of its steel was inadequate, was of poor quality, had not been performance tested, and the sidewall of the container was less than one-fourth of an inch thick.

At the close of plaintiff's case and at the close of all the evidence, F&B moved for a directed verdict. After the jury returned a verdict against F&B and Speed in benefit of Samantha, F&B moved for judgment notwithstanding the verdict. F&B contended at trial and contends on this appeal that as a matter of law it was not liable to plaintiff. F&B rests its contention on the recognized contract-specifications defense. (See *Hunt v. Blasius* (1978), 74 Ill. 2d 203.) F&B asserts that the evidence established that it did not design the can which it manufactured for Speed and, thus, can avail itself of the defense.

"An independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them." (*Hunt*, 74 Ill. 2d at 209.) Nonetheless, a component part manufacturer can be held strictly liable where the assembler made no substantial change in the part and the injury is directly attributable to a defect in the component part. (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206.) This rule obtains regardless of whether the defect in the component causes it to malfunction or the design of the component renders it faulty. See *Thomas*, 81 Ill. 2d 206.

Judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494.) Further, judgment *n.o.v.* is improper where reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *Wade v. City of Chicago Heights* (1991), 216 Ill. App. 3d 418.

At trial, concerning the issue of the can's design, F&B presented evidence that Speed originally supplied it with a "scale" drawing of the can. Purchase orders from this period reflect that the cans were also originally made out of aluminum. While Speed later directed F&B to change the material from aluminum to one-fourth-inch hot rolled steel, an F&B employee testified that the change from aluminum was never explained to F&B. Speed did not, however, specify that F&B use any particular grade of steel in the manufacture of the can. Thus, F&B selected the particular grade of steel it used based on what was available at local steel supply warehouses. In doing so, F&B purchased from a number of different steel suppliers.

According to F&B's evidence, Speed at some point also directed F&B to place three bosses on the cans. Certain changes regarding the height and diameter of the can were made by Speed and communicated to F&B. According to F&B, Speed never explained that the cans were used to contain clutch housings and assemblies. Russell, Speed's most recent owner, testified that he, himself, never told F&B that the cans were sold as clutch containers, nor did he ask F&B for the blueprint of the can or the material specifications. According to F&B, most of its customers did not explain the end use of their products.

Plaintiff's evidence disputed that F&B did not participate in the can's design or was ignorant of the can's intended use. Plaintiff relied on testimony by Charles Coakley, a highly skilled F&B employee, that the alleged "scale" drawing supplied by Speed looked to him as if it had been drawn by a high school draftsman. According to Coakley, the drawing looked like those brought in by many of F&B's customers. Coakley testified that customers ordinarily came to F&B, made sketches of what they wanted, and F&B would work

from the sketch until they developed it and produced a final drawing. Coakley also admitted that he made some changes to Speed's drawing, which were evidenced by his initialling on the drawing as to the height on the bosses and the can's diameter. Coakley insisted, however, that the changes were Speed's idea, not his, and that paperwork in the file would reflect this fact. Coakley, however, did not bring the papers to court which would support this testimony. Coakley additionally testified that he knew that Speed's bellhousing was almost identical to a part F&B was manufacturing for another company, Race Car Specialty.

Plaintiff's experts testified that the selection of materials is a part of the design of a product. They testified that knowledge of the material is requisite to the design process, and that selection of the material is dependent on the intended use. They testified also that the drawing provided by Speed to F&B was not sufficiently detailed for F&B to fabricate the can. One expert testified that based on the configuration of the product, in his opinion, F&B knew or should have known of the can's intended use.

Consideration of the aforementioned rules with this evidence directs that this was not a case for judgment *n.o.v.* The evidence was conflicting as to whether F&B or Speed alone designed the can. Based on the evidence, reasonable minds could have concluded that F&B participated in designing the can and that the can was in an unreasonably dangerous condition when it left F&B's control. There was sufficient evidence for the jury to reasonably conclude that Speed did not provide adequate specifications for F&B to have merely followed Speed's directions in manufacturing the can. There was also evidence that, even assuming F&B merely complied with Speed's directions, the grade of steel selected by F&B was defective in failing to withstand the pressure

of the exploding clutch parts. In this regard, the jury could also reasonably infer, based on the evidence, that F&B knew of the can's intended use. Positive direct testimony may be contradicted and discredited by circumstantial evidence, discrepancies, omissions, or inherent improbability of the testimony itself. *Lobravico v. Checker Taxi Co.* (1967), 84 Ill. App. 2d 20.

Furthermore, the cases cited by F&B are distinguishable. In *Hunt,* summary judgment was granted for the fabricator, but *uncontroverted* evidence established that the fabricator constructed and installed the product in *strict conformity* to specifications supplied, and the plaintiff did not allege that the specifications were flawed. (*Hunt,* 74 Ill. 2d 209.) In the present case, in contrast, there could be no strict conformity to Speed's unsophisticated drawing, and F&B also selected the steel which proved to be inadequate to the can's intended use, of which F&B might have reasonably known. *Loos v. American Energy Savers, Inc.* (1988), 168 Ill. App. 3d 558, like *Hunt,* also concerned a case of summary judgment in favor of the fabricator which was decided, unlike the present case, on the basis of uncontradicted or conceded evidence as to compliance with specifications. Finally, *Woods v. Graham Engineering Corp.* (1989), 183 Ill. App. 3d 337, concerned a ruling in favor of the component manufacturer based on the existence of an intervening cause which relieved the manufacturer of liability. The unrefuted evidence in the present case established that none of the modifications to the bell-housing which occurred after it left F&B's control bore on why it failed, causing the accident.

We conclude that when all of the evidence is viewed in the aspect most favorable to plaintiff, it does not so overwhelmingly favor F&B as not to permit a contrary verdict from standing. (See *Pedrick,* 37 Ill. 2d 494.) The trial court did not err in denying F&B's motion for judg-

ment notwithstanding the verdict in benefit of Samantha.

### III

### Setoff Application

The following background will assist in understanding the parties' contentions.

Plaintiff's third-amended complaint in this matter was filed in April 1981, and sought a wrongful-death recovery based in strict products liability on behalf of Samantha and David against Great Lakes and Speed. Wesley Law was named as co-plaintiff in the complaint.

In February 1988, Speed filed a third-party complaint seeking contribution from F&B. Approximately two years later, plaintiff entered into a release and settlement agreement with Great Lakes on behalf of both Samantha and David. According to the stated terms of the agreement, Great Lakes was released from all claims by David, both individually and as administrator of Diane's estate in exchange for a sum valued at $861,789. Great Lakes was also released by Law for the amount of $100,000. The trial court found the settlement to be in good faith and, after a hearing, determined that Samantha and David's respective percentages of dependency were 50% as provided for under the Wrongful Death Act (Act). (See Ill. Rev. Stat. 1979, ch. 70, par. 2.) The entire settlement was then distributed by the trial court to David and Samantha so that each of them received $430,894.50. No part of the settlement was allocated to any type of claim other than wrongful death.

In September 1990, plaintiff filed a fourth-amended complaint naming Speed and F&B as defendants. Because the two-year statutory limitations period for commencing wrongful-death actions had expired as to David against F&B, but was tolled as to Samantha due to her minority, the complaint stated two separate

wrongful-death actions: count I for Samantha against F&B and Speed, jointly and severally, and count II for David against Speed alone. Counts IV and V stated survival and wrongful-death actions against Speed by co-plaintiff Law. Count III was subsequently dismissed and was discussed previously in this opinion.

F&B did not object to plaintiff's pleading two separate wrongful-death actions. The case proceeded to trial against F&B and Speed on the plaintiff's several wrongful-death and survival claims.

At trial, the parties recognized that a single wrongful-death verdict would not suffice. The trial court thus instructed the jury, without objection by F&B, that the rights of each plaintiff were separate and distinct, that Samantha and David brought separate actions, and that they were each the real party in interest with regard to the assessment of damages in each action. The trial court also directed the jury that, if it found liability, it should separately assess Samantha's and David's damages and return separate verdicts for them, that the verdict in benefit of Samantha should be in a single sum against both F&B and Speed, that the verdict in benefit of David should be against Speed only, and that each verdict should be based on the pecuniary losses that each of them individually suffered as a result of Diane's death. At no time did F&B object to these instructions or to the use of separate jury forms for counts I and II.

Pursuant to the provided forms, the jury returned the following verdicts:

### "VERDICT FORM I-A

As to the claim of the plaintiff, David Pasquale, for the benefit of Samantha Pasquale, we, the jury find in favor of the plaintiff and against the defendants, F&B Manufacturing Company and Speed Products Engineering and assess plaintiff's damages in the sum of $1,500,000.00."

"VERDICT FORM II-A

As to the claims of the plaintiff, David Pasquale, as Administrator of the Estate of Diana Pasquale, for the benefit of himself, we, the jury, find in favor of the plaintiff and against the defendant, Speed Products Engineering and assess plaintiff's damages in the sum of $150,000.00."

The jury also returned a verdict of $500,000 in favor of Wesley Law. F&B did not object to the three separate verdicts. Shortly thereafter, the trial court entered separate judgments, *nunc pro tunc*, on the several verdicts. F&B did not object to entry of these separate judgments.

F&B subsequently filed a post-trial motion for judgment notwithstanding the verdict which requested, in the alternative, a setoff of $961,789 against what it termed "the total jury verdict" of $2,150,000. This latter amount was comprised, apparently, of the separate verdicts for Samantha, David and Law. More specifically, F&B requested that $861,789 be set off against the "jury verdict for Samantha Pasquale and David Pasquale." F&B additionally recommended that $100,000, paid in the Great Lakes settlement to Law, be applied as a setoff to the verdict in his favor against Speed.

The trial court denied F&B's motion, but granted a setoff of $430,894.50, representing that part of the settlement distributed to Samantha, against the judgment against F&B and Speed in Samantha's benefit. The trial court found that the amount distributed to David, also $430,894.50, acted as a setoff against the judgment against Speed for his benefit. After application of these setoffs, F&B and Speed remained jointly and severally liable for $1,069,105.50 on Samantha's claim; Speed's obligation on David's claim was fully satisfied.

On appeal, F&B argued that the $1.5 million judgment against it should have been reduced to $788,211 by a setoff of the entire settlement amount of $861,789. The appellate court agreed. According to the court, the

plain language of the Contribution Act provides that the "consideration" paid by Great Lakes for the settlement reduced the recovery against F&B "on *any* claim against it." (Emphasis in original.) (252 Ill. App. 3d at 733; see Ill. Rev. Stat. 1979, ch. 70, par. 302(c).) The court further reasoned that, although the case was necessarily presented to the jury as two separate and distinct actions against Speed because David's claim against F&B was barred, there existed, nonetheless, a single cause of action by Samantha and David against Speed. In support of its reasoning, the court relied on authorities holding that the Wrongful Death Act creates no individual right of action in its beneficiaries.

The appellate court found that the trial court should have combined the two separate verdicts for Samantha and David into a single judgment. "[T]hen the trial court should have granted a setoff of $861,789 against the joint portion of the judgment, leaving a total amount owed on the combined judgment of $788,211, for which F&B and Speed would be jointly and severally liable for $638,211 and Speed only would be liable for the remaining $150,000." (252 Ill. App. 3d at 733-34.) The appellate court accordingly remanded for the trial court to combine the two verdicts into a single judgment, and "grant F&B a setoff of $861,789 against the $1.5 million portion of the judgment for which it stands jointly and severally liable." The court directed that the remaining sums were to be distributed pursuant to section 2 of the Wrongful Death Act (Ill. Rev. Stat. 1991, ch. 70, par. 2), "taking into consideration the sums David already received pursuant to the order distributing the proceeds of the settlement." 252 Ill. App. 3d at 734.

In summary, according to the logic of the appellate court, the following setoff calculations should have resulted at the trial level:

| Step One: | $1,500,000 | - verdict against Speed/F&B for Samantha |
| | + 150,000 | - verdict against Speed for David |
| | = $1,650,000 | - combined into one judgment |
| Step Two: | $1,500,000 | - "joint portion" of combined judgment for which Speed/F&B stand jointly and severally liable |
| reduced by | $ 861,789 | - amount of settlement for benefit of Samantha and David |
| | = $638,211 | - remaining amount of combined judgment for which F&B stand jointly and severally liable |
| | $ 150,000 | - remaining amount of combined judgment for which Speed alone stands liable—no setoff applied. |

The parties dispute the correctness of the trial and appellate court's setoff applications. Plaintiff claims that the trial court's application was correct. Relying on *Nudd v. Matsoukas* (1956), 7 Ill. 2d 608, plaintiff contends that judgments under the Wrongful Death Act are not considered indivisible, and that according to *Wilbon v. D.F. Bast Co.* (1978), 73 Ill. 2d 58, under the Act individual rights are now recognized as belonging to the deceased's beneficiaries.

In contrast, F&B claims that the appellate court's resolution of setoff was correct. Relying on *Hazel v. Hoopeston-Danville Motor Bus Co.* (1923), 310 Ill. 38, F&B contends that there are no separate verdicts for the individual beneficiaries in wrongful-death actions. Therefore, there should only have been one verdict rendered for the benefit of both Samantha and David against which the entire settlement should have been set off. F&B also contends that the Wrongful Death Act does not create an individual right in a beneficiary to bring the suit (see *Rodgers v. Consolidated R.R. Corp.* (1985), 136 Ill. App. 3d 191). Rather, the right of action

accrues to the administrator, not to the beneficiary (see *Addison v. Health & Hospital Governing Comm'n* (1977), 56 Ill. App. 3d 533), who must bring a single action on behalf of the class beneficiaries to avoid multiple lawsuits. See *Hall v. Gillins* (1958), 13 Ill. 2d 26.

The Wrongful Death Act provides in pertinent part:

"Every such action shall be brought by and in the names of the personal representatives of such deceased person, and *** the amount recovered *** shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person and *** the jury may give *** damages *** with reference to the pecuniary injuries resulting from such death, to the surviving spouse and next of kin ***." Ill. Rev. Stat. 1979, ch. 70, par. 2.

The Wrongful Death Act permits a recovery for the death of an individual by wrongful act, neglect, or default, where none existed at common law. (*Wilson v. Tromly* (1949), 404 Ill. 307, 310.) The absence of a satisfactory justification for the common law rule against such an action has been extensively discussed, however, by this court. (See *Wilbon*, 73 Ill. 2d at 61-66; *Hall v. Gillins* (1958), 13 Ill. 2d 26, 28-29.) Nevertheless, the Act is viewed, traditionally, as creating the cause of action, which must be brought in the name of the representative, for the pecuniary losses which a surviving spouse and next of kin may have sustained by reason of the death of the injured person. (See *Li Petri v. Turner Construction Co.* (1967), 36 Ill. 2d 597; *Hall*, 13 Ill. 2d at 28; *Nudd*, 7 Ill. 2d at 612; *In re Estate of Edwards* (1982), 106 Ill. App. 3d 635, 638.) The purpose of the Act is to provide such compensation. (See *Knierim v. Izzo* (1961), 22 Ill. 2d 73.) "The statute alone is the source of the right to sue," and "the act should be strictly construed." (*Wilson*, 404 Ill. at 310.) Construction of the Act, however, should not be so technical as to defeat the intention of the Act or the beneficial results thereof when all material provisions have been complied with. See *McDavid v. Fiscar* (1951), 342 Ill. App. 673.

Because the action is viewed as a creature of statute, its conditions of liability proscribe the right of action itself and not merely the remedy alone. One such condition of liability is the time limitation period during which a wrongful-death action must be brought. (Ill. Rev. Stat. 1979, ch. 70, par. 2 (two-year limitation period); see *Wilson*, 404 Ill. at 310; *Bruce v. Halterman-Flynn* (1987), 162 Ill. App. 3d 248, 250-51.) Similarly, the bringing of the suit in the name of the personal representative has been held to be a condition precedent to the right to recover damages. See *Friend v. Alton R.R. Co.* (1936), 283 Ill. App. 366.

The personal representative must bring a single action on behalf of the class beneficiaries to avoid multiple lawsuits. *Hall*, 13 Ill. 2d at 30; see also *Pruitt v. Jockisch* (1992), 228 Ill. App. 3d 295 (requirement that action be brought by representative serves dual purpose of ensuring that interests of all beneficiaries are protected and of avoiding multiplicity of actions).

However, that the right of action in wrongful-death accrues to, and suit must be brought by, a representative does not answer whether the intended beneficiaries are also significantly entitled under the Act. Nor does the fact that a single wrongful-death action is required to be brought to avoid multiple lawsuits answer whether and to what extent individual beneficial recoveries are allowed under the Act to accommodate other purposes. These dual, related themes (the significance as well as the separability of beneficial rights) are resolved upon review of case law pertaining to certain defenses under the Act.

F&B cites to *Hazel v. Hoopeston-Danville Motor Bus Co.*, 310 Ill. 38, which concerned whether the contributory negligence of one beneficiary acted as a defense to bar a wrongful-death action brought by the representative on behalf of that beneficiary and other non-

negligent beneficiaries. Relying principally on the notion that there existed a single, inseparable cause of action for recovery in a single gross amount, the *Hazel* court held that the action was completely barred.

According to *Hazel*, while the contributory negligence of a beneficiary barred the action, rather than that of the plaintiff representative (see *VanMeter v. Goldfarb* (1925), 317 Ill. 620, 622 (right of action is one for benefit of next-of-kin, or real party in interest)), the single-action requirement meant that the beneficiaries possessed but a single, indivisible right to recover. (See also *Rost v. F.H. Noble & Co.* (1925), 316 Ill. 357.) *Nudd*, 7 Ill. 2d 608, revisited the issue and decided otherwise.

In *Nudd*, the court referred to the then most recent amendment of the Act, which had become effective after the cause arose. (Ill. Rev. Stat. 1955, ch. 70, par. 2 ("it shall not be a defense that the death was caused in whole or in part by the contributory negligence of one or more of the beneficiaries").) The court concluded the amendment demonstrated that the concept of the indivisibility of a wrongful-death judgment, which formed the cornerstone of *Hazel*, was "fictitious rather than real." (*Nudd*, 7 Ill. 2d at 615.) Relying on that conclusion as well as additional authorities, *Nudd* held that the contributory negligence of the beneficiary did not bar the action, but only precluded his particular right to recover for pecuniary loss. *Nudd* thus made clear that the beneficiaries' right of recovery was separable where one of the beneficiaries proved to be contributorily negligent. (See also Ill. Rev. Stat. 1979, ch. 70, par. 2 ("the amount of damages given shall not include any compensation with reference to the pecuniary injuries resulting from such death, to such contributorily negligent person or persons"); *Sheley v. Guy* (1975), 29 Ill. App. 3d 361, 366.) *Nudd* also specifically overruled *Hazel v. Hoopeston-Danville Motor Bus Co.* and other

cited cases insofar as they were inconsistent with the decision. See *Nudd,* 7 Ill. 2d at 616.

*Nudd,* nonetheless, allowed that it was the real party in interest's contributory negligence, the beneficiary's, rather than the plaintiff personal representative's, which was significant for purposes of the defense. See also *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 78 ("[t]he persons *entitled to recovery* under the Wrongful Death Act are the widow and next of kin" (emphasis added) and the new cause of action affords protection to the family unit particularly when the "beneficial plaintiffs" are the widow and lineal kinsmen); *cf. Strong v. Hodges* (1951), 344 Ill. App. 306 (release by sole Wrongful Death Act beneficiary barred action by administrator).

In *Wilbon,* 73 Ill. 2d 58, the court addressed whether the intended beneficiaries' minority tolled the Act's two-year limitation period. (See Ill. Rev. Stat. 1979, ch. 70, par. 2.) The *Wilbon* court found that, although the limitations period was a condition precedent to the existence of the statutorily created right, the legislature, in enacting the limitations provision, intended to incorporate within it certain well-recognized common law exceptions regarding the status of minority. *Wilbon* thus held that a beneficiary's minority tolled the two-year limitations period. (*Cf. Dachs v. Louis A. Weiss Memorial Hospital* (1987), 156 Ill. App. 3d 465, 468 (minor beneficiaries' interests in wrongful-death claims toll limitations period in medical malpractice statute).) According to *Wilbon,* a then recently enacted amendment to the Act, which provided that a beneficiary's minority tolled the two-year limitations period (Ill. Rev. Stat. 1977, ch. 70, par. 2), merely stated the law as it already existed.

In reaching its decision, the *Wilbon* court addressed both the significance of the beneficial interests as well as the interests' potential separability. The *Wilbon* court

referred to the Act's history, which demonstrated that "although the action is to be brought 'by and in the names of the personal representatives of such deceased person,' the legislative intent is that the claims are those of the individual beneficiaries." (*Wilbon*, 73 Ill. 2d at 68-70; *Foster v. Kanuri* (1992), 241 Ill. App. 3d 677, 681; see also *In re Estate of Faught* (1983), 111 Ill. App. 3d 1043, 1045 (emphasizing that while real parties in interest are the surviving spouse and next of kin, action is to be brought by personal representative).) The *Wilbon* court further noted that the contributory negligence of one beneficiary "serve[d] to bar only his claim," and that a beneficiary's ultimate recovery after distribution was made on an individualized basis. *Wilbon*, 73 Ill. 2d at 69.

The *Wilbon* court also referred to the fact that the legislature had rejected amending the Act to allow the minority of the *personal representative* to toll the limitations period. The adopted amendment, instead, allowed a *beneficiary's* minority to toll the period. See also *Flores v. St. Mary of Nazareth Hospital* (1986), 149 Ill. App. 3d 371 (holding that minor beneficiaries' claims against additionally named defendants were not barred by running of two-year limitations period); *Gaudette v. Webb* (1972), 362 Mass. 60, 284 N.E.2d 222 (beneficiaries' minority tolled the running of two-year limitations period as to their right to recover through representative just as if their right of action were direct).

On this point, the cases on which F&B relies do little to advance its position. *Addison*, decided prior to *Wilbon*, concerned whether a minor beneficiary in a wrongful-death action against a governmental entity was obligated to timely comply with the one-year notice requirement in the Governmental Tort Immunity Act. Finding *Fanio v. John W. Breslin Co.* (1972), 51 Ill. 2d 366, dispositive, *Addison* held that the minor beneficiary was obligated. *Addison* reasoned that, since the

burden of bringing the suit was imposed on the plaintiff representative, that party's failure to comply, rather than the beneficiary's, barred the action. (See *Fanio*, 51 Ill. 2d at 368-69 (commenting that the reasons inherent in removing minors from the scope of Governmental Tort Immunity Act notice and limitations requirements were totally lacking in the wrongful-death action where a representative brings the suit).) *Wilbon*, however, later called that reasoning into question. *Cf. Girman v. County of Cook* (1981), 103 Ill. App. 3d 897 (rejecting *Addison* on similar facts and, instead, following *Wilbon*).

*Rodgers*, 136 Ill. App. 3d 191, also relied on by F&B, merely applies the correlative of the rule that the right of action accrues to the representative, that is, a beneficiary possesses no individual right to bring his or her own suit. The *Hazel* decision, as mentioned previously, was overruled with respect to the notion that the wrongful-death action is one which is indivisible. See *Nudd*, 7 Ill. 2d at 616.

Courts in other jurisdictions, in deciding whether a beneficiary's minority tolled the limitations period, have expressly relied on the concept that each wrongful-death beneficiary has an independent and separate right to recovery. In *Cross v. Pacific Gas & Electric Co.* (1964), 60 Cal. 2d 690, 388 P.2d 353, 36 Cal. Rptr. 321, the court stated that, although the recovery is in the form of a "lump sum," the *amount* is determined in accordance with the various beneficiaries' separate interests in the deceased's life and the loss suffered by each by reason of the death. Therefore, each beneficiary was to be regarded as having a personal and separate cause of action. Since that concept supported the settled rule that the contributory negligence of one beneficiary barred his recovery, but not that of others (see *Nudd*, 7 Ill. 2d 608), *Cross* held that the running of the limitations period against adult heirs did not affect the rights of minor heirs.

*Parker v. Chrysler Motors Corp.* (1972), 88 Nev. 560, 502 P.2d 111, reasoned and held similarly. The *Parker* court pointed out that the Nevada wrongful-death statute did not create a joint cause of action, that the thrust of the statute was merely to have all beneficiaries joined in one action, and the mere fact that the judgment was to be in a lump sum did not destroy the separability of the beneficial interests, since either the beneficiaries or the court might apportion the award. *Parker* held that a defense good against the claim of one heir was not fatal to the others and, thus, the running of the limitations period did not bar the rights of the minor beneficiaries. See also *Hun v. Center Properties* (1981), 63 Haw. 273, 279, 626 P.2d 182, 187; *Switzer v. Reynolds* (Utah 1980), 606 P.2d 244; *cf. Hogan v. Herman* (1980), 101 Idaho 893, 898, 623 P.2d 900, 905 (Bistline, J., specially concurring).

While F&B is correct in asserting that the right of action for a wrongful death accrues to the personal representative, our review convinces us that the Act's beneficiaries yet possess a distinct, but complementary, right of recovery. Furthermore, we conclude that the logical implication which follows from the allowance of minority tolling and the operation of contributory negligence as but a partial bar to recovery is that the beneficiaries' rights to recovery in such instances are separate and divisible.

Further, where the beneficiaries' rights to recovery are separate due to the operation of minority tolling in the face of time-barred adult beneficiary claims, that separation is substantive under the Act, rather than merely procedural. In the case of a limitations period in a statute, such as the Act, which creates a substantive right unknown to the common law and in which time is made an inherent element of the right, such a time period is more than an ordinary statute of limitations: it is

a condition of the liability itself and not of the remedy alone. Such a provision is a condition precedent and as such may extinguish the cause of action itself. Such a provision goes to subject matter jurisdiction and is not merely mandatory. See *Fredman Brothers Furniture Co. v. Department of Revenue* (1985), 109 Ill. 2d 202, 209; *Haakanson v. Wakefield Seafoods, Inc.* (Alaska 1979), 600 P.2d 1087, 1091 (discussing traditional view that wrongful-death limitations period is limitation on the right not the remedy and therefore not subject to disabilities tolling ordinary limitations).

Thus, in instances, as in the present case, where the limitations period precludes an adult beneficiary's claim against a particular defendant, that beneficiary's very cause of action against that defendant is nonexistent. Certainly then, it is clear that a minor beneficiary's claim against that same defendant, which survives the bar, cannot constitute *substantively* the same claim as that of the adult beneficiary against any other party defendant. Here, the fact that the liability owed the minor is also shared by one such other party defendant results in no contrary outcome. Speed's shared liability with F&B in benefit of Samantha was joint and several and, therefore, substantively indivisible. We therefore disagree with the appellate court. (252 Ill. App. 3d at 733.) Speed's liability to Samantha did not constitute Speed's liability to David. Accordingly, we conclude that the wrongful-death claim brought by the plaintiff representative in benefit of Samantha was a separate claim from that brought for the benefit of David.

Our inquiry, however, is not yet completed. We must consider these separate claims in the context of setoff under the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*).

Section 2(c) of the Contribution Act provides that when a settlement release is given in good faith to one

tortfeasor liable in wrongful death, it does not discharge the liability of any of the other tortfeasors for the same wrongful death, but reduces "the recovery" on any claim against them to the extent of the amount stated in the release or actually paid for it. (See Ill. Rev. Stat. 1979, ch. 70, par. 302(c).) Section 2(c) reflects the long-recognized principle in Illinois that a plaintiff shall have only one satisfaction for an injury. (See *Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 558.) A double recovery is a result which is condemned and is exactly what section 2(c) of the Contribution Act was intended to prevent. *Wilson v. The Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 321-22; *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, 208.

The provision reflects as well the public policy of protecting the financial interests of nonsettling parties in a settlement. (*Wilson*, 131 Ill. 2d at 322.) Allowing setoff ensures that a nonsettling party will not be required to pay more than its *pro rata* share of the shared liability.

Thus, under section 2(c), it has been held that a settlement between one tortfeasor and the plaintiff will result in an equal setoff in amount against the recovery a nonsettling tortfeasor receives. (See *Patch v. Glover* (1993), 248 Ill. App. 3d 562; *Higginbottom v. Pillsbury Co.* (1992), 232 Ill. App. 3d 240; *Nguyen v. Tilwalli* (1986), 144 Ill. App. 3d 968; *cf. Dial v. City of O'Fallon*, 81 Ill. 2d at 558 (confirming the previously recognized common law right to a setoff).) Further, a nonsettling defendant may claim as a setoff any amount which the plaintiff recovered in a prior settlement with settling defendants, even if the resultant judgment is thereby reduced to zero dollars. See *Foster v. Kanuri* (1992), 241 Ill. App. 3d 677; *Nguyen*, 144 Ill. App. 3d at 973.

Under section 2(c), while a nonsettling tortfeasor might seek to utilize the entire amount of a prior settle-

ment as a setoff, the only amounts that may normally be applied are those which compensated for the same injury or wrongful death for which the tortfeasor was ultimately found liable. (See *Patton v. Carbondale Clinic, S.C.* (1994), 161 Ill. 2d 357, 366.) The determination as to which of several claims a settlement award should be attributed to is considered a matter within the trial court's discretion. (See *Gramse v. Royal Crest Enterprises, Inc.* (1981), 100 Ill. App. 3d 100; see also *Dick v. Gursoy* (1984), 124 Ill. App. 3d 185, 189a-89b (supplemental opinion).) The Contribution Act permits contribution (or setoff) where co-tortfeasors are concurrent or successive as long as the "same injury" or wrongful death is involved. (See *Nguyen*, 144 Ill. App. 3d at 971-72; *Giordano v. Morgan* (1990), 197 Ill. App. 3d 543, 550.) Generally, the party seeking the setoff bears the burden of proving what portion of a prior settlement was allocated or is attributable to the claim for which he is liable. (See *Kipnis v. Meltzer* (1993), 253 Ill. App. 3d 67 (nonsettling tortfeasor denied setoff of entire settlement amount for failure to establish what portion of settlement was attributable to claim for which it found liable).) This court, however, has found that where a plaintiff recovers for several injuries in a previous lawsuit and fails to apportion damages accordingly, a subsequent defendant may be relieved of this burden. See *Patton*, 161 Ill. 2d at 370.

The Contribution Act, however, provides little guidance as to what constitutes the "same injury." (*Giordano*, 197 Ill. App. 3d at 550 ("in order for contribution [or setoff] to lie, at least some type of culpable conduct must exist which contributed to plaintiff's injuries").) It is clear, however, that the entire amount of a settlement which compensated for a single indivisible injury can be set off against a recovery based on that injury, notwithstanding the plaintiff's assertion of two distinct

*theories* of recovery. (See *Hall v. Archer-Daniels-Midland Co.* (1988), 122 Ill. 2d 448, 459.) It is also clear that a setoff is inappropriate where sought to be applied against a recovery for injuries "separate and distinct" from those for which the plaintiff was already compensated through settlement. See *Patton*, 161 Ill. 2d at 366, citing *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 431-32.

Thus, in *Barkei v. Delnor Hospital* (1990), 207 Ill. App. 3d 255, 266-67, where a pretrial settlement compensated plaintiffs for bodily injuries, medical expenses and loss of society, setoff was found to only have been appropriate to the extent that the settlement compensated plaintiffs for medical expenses, which was the sole basis of the nonsettling tortfeasor's liability. Similarly, in *Eaton v. Jackson* (1984), 128 Ill. App. 3d 893, a setoff against a recovery for the plaintiff husband's personal injuries was limited to that part of the settlement attributed by the trial court to his claim, to the exclusion of that part attributed to the plaintiff wife's loss-of-consortium claim. (*Cf. Patch v. Glover* (1993), 248 Ill. App. 3d 562 (remanding for a setoff limited to that portion of settlement allocable only to wrongful-death claim).) Also, where a particular element of damages (ongoing and future loss of wife's services and consortium) partially comprises a wrongful-death settlement, and that element is subsequently eliminated from the ultimate total damage award, a rational setoff of those damages is impossible if the particular damage element is unallocable within the settlement. See *Dolan v. Gawlicki* (1994), 256 Ill. App. 3d 153, 157.

On the issue of allocation of settlement proceeds, *Foster v. Kanuri* (1992), 241 Ill. App. 3d 677, cited by F&B, is somewhat unclear. In *Foster*, the plaintiff's complaint alleged both wrongful-death and survival claims against several defendants. Prior to trial, two of the defendants settled with the plaintiff. The trial court

entered a good-faith finding regarding the settlement and determined the two beneficiaries' percentages of dependency under the Wrongful Death Act. Presumably, the court also distributed the proceeds accordingly. The jury subsequently returned a verdict which included damages for both the two beneficiaries' wrongful-death claims and the survival claim. The nonsettling defendant sought to set off the entire amount of the prior settlements against the verdict. The trial court, however, both limited the setoff to that portion of the prior settlements attributable to the wrongful-death claims and applied the allocated settlement amounts as setoff to the beneficiaries' distinguishable recoveries. The appellate court reversed. Despite that there appears little indication that the prior settlement included both the wrongful-death and survival claims, the appellate court spoke approvingly of allowing the defendant to set off the entire settlement (*Foster*, 241 Ill. App. 3d at 680-81). The appellate court then remanded for a re-allocation of the settlement in accordance with the separate nature of the initially alleged claims. While *Foster* spoke to settlement allocation in the case of distinct causes of action, it offered no opinion concerning allocation and setoff in the case of timely and barred wrongful-death claims. We believe that defendant may draw little support from *Foster*.

In the present case, by virtue of the operation of minority tolling, there was not a single and indivisible wrongful-death action such that the individual beneficiaries' pecuniary injuries were inseparable for purposes of setoff. (*Cf. Klier v. Siegel* (1990), 200 Ill. App. 3d 121, 127.) The limitation which barred a claim for David against F&B goes to subject matter jurisdiction, affecting not merely the remedy, but the right of action itself. Based on *Nudd*, *Wilbon*, and the Act's minority tolling provision, we conclude that a wrongful-death claim

which is barred as untimely where brought for an adult beneficiary, but tolled where brought for a minor beneficiary, is a separate and distinct claim from that brought solely for the adult. Therefore, the claim against F&B and Speed in benefit of Samantha (count I) was substantively separate and distinct from the claim asserted against Speed in benefit of David (count II). Because of the minority tolling and the consequent joint and several joinder, the case at trial involved two separate and distinct claims, only one of which was successfully asserted against F&B.

Although the Great Lakes settlement was unallocated by the parties themselves, it was obviously intended to compensate both Samantha and David for their respective claims for pecuniary loss. Under the Contribution Act, F&B was entitled to a setoff reducing its liability because it was also obvious that the Great Lakes settlement extinguished liability for the same injury (pecuniary losses suffered by Samantha) for which F&B owed a recovery. However, because F&B's request for a setoff necessarily rests on the premise that it paid more than its *pro rata* share of the shared liability for Samantha's injury, F&B bore the burden of establishing how much of the Great Lakes settlement was intended to compensate for her loss. (See *Barkei*, 207 Ill. App. 3d 255; *Kipnis*, 253 Ill. App. 3d 67; see also *Houser v. Witt* (1982), 111 Ill. App. 3d 123, 125.) This is not a case like *Patton* where the defendant was not a party to the suit underlying the prior settlement. In the absence of such proof, the trial court reasonably considered that its determination of Samantha's and David's percentages of dependency supported an allocation of the settlement between their respective claims. See *Bart v. Union Oil Co.* (1992), 236 Ill. App. 3d 964, 966 (trial court has discretionary authority in allocating settlement amount between various claims); see also *In re Estate of Flake*

(1985), 137 Ill. App. 3d 535, 536 (division of an award in a wrongful-death action is left to discretion of trial court).

Moreover, the trial court's dependency determination did not control the allocation of the settlement so much as it reflected merely the obvious: that because there were two family member claimants, it was reasonable that half of the settlement was intended by Great Lakes to compensate Samantha and half was intended for David. Regardless of any disparity between Samantha's and David's later recoveries as a result of trial, we cannot say that based on this record the trial court abused its discretion by allocating the settlement with reference to the beneficiaries' equally shared dependency.

Considering that reasonable allocation and the fact that two separate claims resulted in verdicts reflecting assessments of Samantha's and David's individual pecuniary losses, the trial court correctly declined to set off the entire settlement and limited F&B's setoff to Samantha's part only. (See *Johnson v. Belleville Radiologists, Ltd.* (1991), 221 Ill. App. 3d 100 (amounts apportioned to separate claims in settlement agreement should not operate as single setoff against verdict based on separate claims).) It is manifest that David's part of the settlement did not extinguish Great Lakes' potential liability for the same pecuniary injury for which F&B was found liable.

Furthermore, the trial court's setoff application will not result in a double recovery for Samantha and David. Like any other plaintiffs seeking tort damages, Samantha and David were compensated by Great Lakes for their respective claims. The jury subsequently returned verdicts in their favor against certain defendants, which were reduced by amounts paid to them by other potentially liable parties. F&B's problem with the

trial court setoff is not so much that Samantha will recover twice. F&B's problem is that Speed's minimal liability to David was fully satisfied, and no part of the larger settlement attributable to David's claim can be used to offset F&B's shared liability with Speed to Samantha. This sort of disparity results, however, in every tort action with distinct and separate claims where prior settlements are disproportionate to the eventual jury verdicts. However, in such cases, a settlement in contemplation of one claim is simply not available to offset recovery on an entirely different claim and a plaintiff is not considered to have received a double recovery.

In contrast to the trial court here, the appellate court first stated that the two separate verdicts for Samantha and David must be combined into one judgment ($1.65 million), but then it paradoxically directed setoff of the entire settlement amount against only that portion of the judgment for which F&B and Speed were jointly and severally liable ($1.5 million). The appellate court apparently interpreted the Contribution Act to provide literally that any setoff reduce the recovery on any claim to which *all* the nonsettling tortfeasors were exposed. (See Ill. Rev. Stat. 1991, ch. 70, par. 302(c) ("reduces the recovery on any claim against the others").) As a result, the entire settlement, including that which reasonably extinguished Great Lakes' liability to David, would be applied against a recovery to which David was substantively barred.

Also, no part of the settlement utilized to extinguish David's claim would then be available for setoff against the separate verdict for David's benefit against Speed. F&B would thus not only be enabled to obtain a reduction of its liability by virtue of settlement amounts paid for claims to which it was not exposed, but it would also be unfairly advantaged at Speed's expense. Therefore, to the extent that the appellate court held that the set-

off of the entire settlement was to be applied against the joint and several liability of F&B and Speed to Samantha, we conclude that the determination was incorrect.

In summary, we agree with the plaintiff that Samantha is entitled under the Contribution Act to realize her full recovery despite application of setoff. (See Ill. Rev. Stat. 1979, ch. 70, par. 304.) We conclude that the trial court appropriately allocated Samantha's share of the settlement and correctly applied a setoff against the recovery which was in her benefit only. We conclude also that the trial court correctly set off the recovery due David by Speed.

## CONCLUSION

We affirm the appellate court's determination that the trial court properly directed a verdict in Speed's favor and denied F&B's motion for judgment notwithstanding the verdict. We reverse that part of the appellate court's decision concerning the application of the prior settlement as a setoff against the wrongful-death recovery and the subsequent remand to the trial court. The judgment of the circuit court is affirmed.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed.*

JUSTICE McMORROW, dissenting:

I disagree with the majority's conclusion that a plaintiff-bystander should not be allowed to recover damages for emotional distress injuries in a strict product liability cause of action. The majority's position lacks logic and leads to arbitrary results. The majority allows plaintiffs who seek recovery for emotional distress injuries under a negligence theory to recover for emotional injuries, yet denies plaintiffs suing under a strict liability theory recovery for emotional injuries. Further, the evolution of Illinois case law in the direc-

tion of compensating plaintiffs for emotional distress damages supports the allowance of recovery in strict liability causes of action. Finally, the policy considerations that justify the imposition of strict liability on sellers and manufacturers of defective products, and the rationale for compensating victims who suffer emotional injuries in negligence actions favor the position that emotional distress damages should be compensable in strict liability actions. For these reasons, I respectfully dissent.

In Illinois, a plaintiff can recover damages for emotional distress injuries in a negligence action. (See *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546; *Corgan v. Meuhling* (1991), 143 Ill. 2d 296.) However, our courts have declined to permit recovery for emotional distress damages in actions based on strict liability. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26; *Rahn v. Gerdts* (1983), 119 Ill. App. 3d 781.) Logically, it is difficult to reconcile these two positions.

To sustain a cause of action in negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, a breach of that duty and an injury proximately caused by the breach. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140.) In a strict product liability action, plaintiffs "must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.

One of the key differences between negligence actions and strict liability actions is that in a strict liability action the plaintiff need not prove negligent conduct on the part of the defendant. (See *Suvada*, 32 Ill. 2d at 623.) In other words, the element of "fault" or unreasonable conduct necessary in negligence actions

need not be proved in actions based on a theory of strict liability. (W. Keeton, Prosser & Keeton on Torts § 75, at 536-38 (5th ed. 1984).) Both negligence and strict tort liability law share the common purpose of compensating persons injured at the hand of another. However, the elimination of the fault element in strict liability claims bears upon the *liability* aspect of tort claims, and does not logically alter or diminish the personal injury damages to which the plaintiff is entitled.

The law of products liability in Illinois mandates that if a defendant manufactures and puts into commerce a product in an unreasonably dangerous condition, and if that product causes injury to a consumer, that defendant may be held liable for such personal injuries. (*Suvada*, 32 Ill. 2d 612.) It is arbitrary and illogical to maintain that such a defendant must compensate the injured person for only physical injuries, but not injuries from emotional trauma. The allowance of recovery for severe emotional distress damages to a plaintiff-bystander whose lawsuit is based on a negligence theory is inconsistent with denial of recovery for the same severe emotional distress injuries in a lawsuit based on a strict product liability theory. The injuries in both causes of action may be identical, the defendant's conduct which supports liability in both causes of action may be identical, and the defendant's duty to the plaintiff may also be identical. The difference in theories of liability does not justify a difference in the allowance of certain compensable damages. Oratorically questioning, what valid basis, and none has been offered by the majority (the majority's arguments relate to "liability" or fault issues) nor *Woodill* nor the Restatement, is there for treating plaintiff's injuries differently in these two causes of action?

The progression of Illinois case law toward permitting plaintiffs to recover damages for emotional distress

supports the allowance of recovery for emotional distress injuries in strict liability cases. For example, in *Knierim v. Izzo* (1961), 22 Ill. 2d 73, this court ruled that a plaintiff need not allege physical injury or symptoms in order to maintain an action for intentional infliction of emotional distress. The court reasoned that "[t]he stronger emotions when sufficiently aroused do produce symptoms that are visible to the professional eye and \*\*\* jurors from their own experience will be able to determine whether outrageous conduct results in severe emotional disturbance." (*Knierim*, 22 Ill. 2d at 85.) In *Rickey*, 98 Ill. 2d 546, this court eliminated the requirement of a contemporaneous injury or impact as a prerequisite to recovery for negligently caused emotional distress. More recently, this court in *Corgan* held that the victim of a defendant's negligence need not allege physical symptoms or injuries to recover damages for emotional distress, noting that "[i]n the 30 years since *Knierim*, this court has not lost its faith in the ability of jurors to fairly determine what is, and is not, emotional distress." (*Corgan*, 143 Ill. 2d at 312.) The law recognizes that people may suffer both physical and emotional injuries. It is inequitable to make compensation for emotional distress injuries dependent on the theory upon which the plaintiff establishes the defendant's liability. In light of this precedent, allowing plaintiffs to recover damages for such injuries in strict liability actions is a logical and salutary extension of Illinois law.

The majority relies primarily on section 402A of the Restatement and the 1980 case of *Woodill v. Parke Davis & Co.* to deny recovery for emotional distress damages. In *Woodill*, this court summarily adopted the decision of the appellate court to conclude that emotional distress damages could not be recovered in a strict liability action. (*Woodill*, 79 Ill. 2d at 38.) The appellate court in *Woodill* reasoned that because the Restatement "pro-

vides that '[o]ne who sells any product in a defective condition unreasonably dangerous to user or consumer or to his property is subject to liability for *physical harm* thereby caused to the ultimate user or consumer ***' " no cause of action existed in strict liability for emotional distress damages. (Emphasis in original.) (*Woodill v. Parke Davis & Co.* (1978), 58 Ill. App. 3d 349, 355, quoting Restatement (Second) of Torts § 402A (1965).) The court also noted that "at present, Illinois recognizes no such action." *Woodill*, 58 Ill. App. 3d at 355.

*Woodill*, the only precedent of this court which supports the majority's conclusion that no action for emotional injuries exists based on a strict liability theory, sets forth no analysis, rationale or logic to explain its position. Further, *Woodill* was decided when Illinois only allowed recovery for intentional infliction of emotional distress. Since *Woodill*, Illinois law has progressed to allow recovery for emotional injuries based on negligent conduct. (See *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546.) Both *Woodill* and the majority adopt section 402A of the Restatement which states that a plaintiff suing under a strict product liability theory can recover for "physical harm" caused. However, the Restatement also fails to offer an analysis explaining the reasons that victims should not be allowed to recover for emotional injuries in strict product liability actions. (See Restatement (Second) of Torts § 402A (1965).) Neither *Woodill* nor the Restatement offers a logical analysis because, as previously discussed, there is no logical justification for reducing the injuries for which a plaintiff may recover simply because plaintiff's burden of proving liability has been eased due to public policy concerns.

Additionally, the policy considerations that justify the imposition of strict liability on sellers and manufacturers of defective products support the proposition that

such defendants should be held liable for both physical and emotional injuries caused by their products. "[I]t seems obvious that public interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present *** in cases involving motor vehicles and other products ***." (*Suvada*, 32 Ill. 2d at 619.) Strict product liability law also seeks to deter the sale of unsafe products and compensate injured victims. (Corboy, *The Not-So-Quiet Revolution: Rebuilding Barriers to Jury Trial in the Proposed Restatement (Third) of Torts: Products Liability*, 61 Tenn. L. Rev. 1043, 1058 (1994).) In *Corgan*, this court stated in unqualified terms that emotional injuries are very real injuries, which are discernable by juries. (*Corgan*, 143 Ill. 2d at 311-12.) In light of this court's recognition of the realties of emotional distress in *Corgan*, emotional trauma such as that alleged in the case at bar is an "injury" to a person to the same extent as a broken bone, a laceration or an injured back. Illinois has placed the burden of paying for injuries caused by defective products on the enterprises that place such products in the marketplace, and the law recognizes that a person may suffer from both physical and emotional injuries. It is inequitable to make compensation for such injuries dependent on the theory upon which the plaintiff establishes the defendant's liability.

David has shown that he was in the zone of physical danger; that due to the failure of the defendant's defective bellhousing he had a reasonable fear for his own safety; that he has suffered from severe emotional distress; and that he was in such proximity to the accident that there was a high risk to him of physical impact. (See *Rickey*, 98 Ill. 2d 546; *Corgan*, 143 Ill. 2d 296.) David was sitting next to his wife as she was

partially decapitated. In fact parts of her body struck him. He touched her face and head, and then carried her to the ambulance knowing that she was dead. David has alleged many of the traumatic neuroses noted in *Corgan.* (*Corgan*, 143 Ill. 2d at 311.) Considering the facts of this case, David has suffered severe injuries as a result of witnessing his wife's violent death. The majority's position creates an arbitrary and hollow distinction, unsupportable in light of the development of the law of emotional distress damages. I would hold that the trial court should have instructed the jury on David's claim for emotional distress damages. Accordingly, I respectfully dissent.

JUSTICE HARRISON joins in this dissent.