151 F.3d 1033
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
In re JOHN ROBERT MEYER, Debtor.
Forest G. Niccum and Marvel Contaminant Control Industries,
Inc., Plaintiffs-Appellants, Cross-Appellees,
v.
J. Robert Meyer, Defendant-Appellee, Cross-Appellant.
 Nos. 97-2318, 97-2492, 98-2090.
 United States Court of Appeals, Seventh Circuit.
 Argued March 30, 1998.
Decided Aug. 21, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 95 C 6639 William T. Hart, Judge.
 Before Hon. DANIEL A. MANION, Hon. ILANA DIAMOND ROVNER, Hon. TERENCE T. EVANS, Circuit Judges.
 
 ORDER
 
 1
 This appeal concerns the amount of damages a bankrupt lawyer, J. Robert Meyer, owes his former client, businessman Forrest Niccum,[1] after allegedly purchasing several assets from him for little or no consideration. The district court, Judge William T. Hart, found that any damages Meyer owed were completely offset by a $12 million recovery Niccum received from Meyer's former law firm.
 
 
 2
 The facts in this case are complicated, no doubt in part because Niccum and Meyer were involved in heavy duty tax avoidance. We will try to set out those facts as best we can from a record that is a bit less than crystal clear. The story begins around 1980, when one of Niccum's many companies, Marvel Engineering Company (Engineering), a 25-employee operation which produced components for defense manufacturers, gave him a $20 million note. In 1982 Meyer, Niccum's lawyer from 1973-87 (from 1983 to 1987 with the prestigious Chicago law firm of Seyfarth, Shaw, Fairweather and Geraldson) noticed certain revenue rulings suggesting that the IRS might treat the payments Niccum received under the note as dividends and tax them as income. To prevent this, he had Niccum assign the note to another one of his companies, Marvel Contaminant Control, Inc.
 
 
 3
 However, even after that transfer Meyer still worried. To further sever the relationship between the debtor company, Engineering, and the creditor, Niccum, Meyer advised Niccum to sell Engineering to him. Niccum declined.
 
 
 4
 Meyer kept pressing his idea, and 3 years later, in December 1985, Niccum finally agreed to the sale. They signed a stock purchase agreement on December 30 that called for Niccum to sell all of Engineering's stock to Meyer[2] for $5,000 down with a $995,000 note to cover the balance. Meyer was to pay the note off in installments of $25,000 per quarter for 10 years; Engineering also had to pay off another note for about $10 million before the sale would be final. The agreement required Niccum to continue to manage the day-to-day operations of Engineering--apparently because Meyer, a desk lawyer, was unfamiliar with the actual running of the business.
 
 
 5
 To secure Meyer's promise to pay these notes, the parties signed a pledge agreement. It obligated Meyer to give certificates representing Engineering's stock to an escrow holder on the day of the sale. The escrow holder would keep the certificates until Meyer made all his payments, and during that time Niccum would retain the right to vote the shares. In case Meyer defaulted, the escrow holder would return the certificates to Niccum, who could sell them (and thus the company) as a secured party under the Uniform Commercial Code. However, Niccum's stock certificates were never given to the escrow holder. Instead, Niccum kept them in a vault that he controlled.
 
 
 6
 The day after the sale, despite the stock purchase agreement, few things changed. Niccum still controlled Engineering and managed it on a day-to-day basis. And he still had his stock certificates safely tucked away.
 
 
 7
 On the same day as the Engineering deal, Meyer acquired a property at 2085 Hawthorne Avenue in Melrose Park, Illinois, the site of Engineering's plant, from Hawthorne Enterprises, a subsidiary of Marvel Contaminant--Engineering leased the property for $260,000 a year. While the facts surrounding the deal are far from clear--there is no record of a contract of sale or payment of consideration for the property--we know that Meyer conveyed the Hawthorne property to a land trust at American National Bank and inserted the name of one of his corporate shells, Marvel Industries (Industries), as the beneficiary. Simultaneously, on behalf of Industries, Meyer put the Hawthorne property up as collateral for a $2.5 million loan from American. Meyer also gave the bank a security interest in Engineering as additional collateral and executed a lease between Industries and Engineering for rent in the amount of the monthly mortgage payment.
 
 
 8
 Despite the liberties Meyer took with its assets and finances, Niccum was still the president of Engineering. According to Meyer, even after the sale Niccum withdrew money from Engineering at will. For his part, Meyer never made any of the payments on the $995,000 note.
 
 
 9
 Matters came to a head in early 1988, after Meyer's resignation from Seyfarth. Niccum, through another Seyfarth lawyer--he was still using the firm, even in his dealings with Meyer--sent Meyer a letter saying that their agreement was "null and void and of no force or effect" because of Meyer's failure to make any payments on the note. After Meyer ignored the letter, Niccum sued him, alleging that he fraudulently exerted undue influence during the sale of Engineering and the Hawthorne property. Meyer counterclaimed for breach of the stock purchase agreement.
 
 
 10
 The case proceeded until Meyer filed for bankruptcy on April 9, 1992. Niccum quickly filed an adversary complaint in Meyer's bankruptcy case, making the same allegations that appeared in his federal lawsuit. Judge Hart withdrew Niccum's adversary proceeding from the bankruptcy court (under 28 U.S.C. § 157(d)) and consolidated it with the federal suit. The bankruptcy court then lifted the automatic stay, allowing the litigation to resume.
 
 
 11
 Meanwhile, Niccum was pursuing other avenues of recovery. On November 13, 1992, he filed a demand for arbitration against Seyfarth claiming that the firm was liable (1) for Meyer's representation of, and dealings with, Niccum, (2) for the involvement of other Seyfarth attorneys in Meyer's dealings with Niccum, and (3) for its decision to represent Niccum in transactions with Meyer after Meyer left the firm. Niccum claimed $34,563,604 in damages from 24 different matters, among them the Engineering ($11,630,077) and the Hawthorne property ($2,829,001) disputes. Meyer was not involved, directly at least, in this proceeding which pitted Niccum against the law firm.
 
 
 12
 Niccum eventually settled with Seyfarth for $12 million. As part of the settlement Niccum retained all causes of action against Meyer but released and covenanted not to sue Seyfarth for any claim arising out of "Meyer's legal representation or involvement with [Niccum.]" Nevertheless, the settlement didn't allocate the $12 million to any particular injuries. It did, however, provide that if Niccum recovered from Meyer
 
 
 13
 property valued at over $5,000,000, then any sums over that amount will be split equally between [Niccum] and Seyfarth Shaw ... provided, however, that the amount paid Seyfarth Shaw shall not exceed $12 million. Any recovery by [Niccum] of (i) the land and buildings located at 2085 North Hawthorne Avenue [and/or] (ii) Marvel Engineering Company, a Delaware corporation, or the assets owned thereby ... shall not be included among the recovered property that is to be split with Seyfarth Shaw.
 
 
 14
 Returning to the federal case, on July 25, 1994, Judge Hart granted summary judgment in favor of Niccum on his undue influence claim. Niccum v. Meyer, 171 B.R. 828, 834 (N.D.Ill.1994). In Illinois a presumption exists to the effect that an attorney has defrauded his client when that "attorney engages in a transaction with a client and is benefitted thereby," Klaskin v. Klepak, 126 Ill.2d 376, 128 Ill.Dec. 526, 534 N.E.2d 971, 975 (1989), and with Meyer saying that he owned the assets, Judge Hart found that he benefitted from the Engineering and Hawthorne property transactions. Meyer offered no evidence to rebut the presumption of fraud, and Judge Hart found him liable and remanded the case to the bankruptcy court for a determination of dischargeability and appropriate relief.
 
 
 15
 The bankruptcy court, Judge Thomas James, held Meyer's debt nondischargeable under 11 U.S.C. § 523(a)(4) (denying a discharge "from a debt ... for fraud or defalcation while acting in a fiduciary capacity"). In cases of undue influence the client can elect to either rescind the deal or win market damages, and Niccum elected damages--probably because the current (1994) value of Engineering was far below its value in 1985. Because the parties disputed the market value of Engineering, Judge James held a trial on the point.
 
 
 16
 At that trial, after testimony about the value of Marvel Engineering, Judge James accepted the valuation of Niccum's expert, who pegged Engineering's value at $14,520,743.17 (in 1985). Finding that Meyer paid no consideration for the company, Judge James used that figure as the market damages for the sale. He found that the market damages from the sale of the Hawthorne property came to $3,069,638.48 and, adding in other minor awards, the total came to $17,779,561.65.
 
 
 17
 Meyer tried to set off Niccum's $12 million recovery from Seyfarth. The lack of any allocation in the settlement combined with the fact that some claims in the arbitration proceeding weren't involved in the federal suit made it impossible for Judge James to figure out how much of the settlement actually compensated Niccum for the Engineering and Hawthorne property frauds. Without this knowledge, he refused to set off any of the damage award against the settlement.
 
 
 18
 Meyer appealed the bankruptcy court's ruling to the district court. There, for the first time, he asserted that Niccum owned Engineering, pointing at Niccum's failure to transfer his stock certificates to an escrow holder, and argued that ownership of the stock and a damages award gave Niccum a double recovery. Ignoring Meyer's waiver, Judge Hart found merit to his argument--in effect reconsidering his grant of summary judgment on the undue influence claim concerning Engineering; if Niccum always owned Engineering, how could Meyer have cheated him out of it? On September 18, 1996, he vacated Judge James' damages award and, instead of remanding, he withdrew the issue and elected to retry it himself.
 
 
 19
 In the meantime, Niccum had been trying to recover title to the Hawthorne property. American National Bank, the mortgagee, filed a foreclosure action and notified Niccum, who in turn sued the bank, alleging that it acted improperly during the original fraudulent sale of the property. The suit settled, with Niccum paying the bank $800,000 (along with $71,000 for legal fees) in exchange for the bank's assignment of all of its rights to the Hawthorne property. Niccum then stepped into the bank's shoes in its foreclosure action and proceeded to purchase the property (on credit from the outstanding loan) right after the bankruptcy court's ruling. Niccum spent $250,000 on his own legal fees in the process.
 
 
 20
 Back in the federal suit, Judge Hart retried the damages issues in the spring of 1997. Afterwards he found that Niccum remained the owner of Engineering, despite the stock purchase agreement, because he (1) continued to operate, manage and control Engineering and (2) failed to complete the sale by refusing to part with the stock certificates. This meant that Niccum couldn't get market damages, and with the only other damage being a $103,377 debt that Meyer owed to Engineering, Judge Hart modified the award accordingly.
 
 
 21
 Noting that Niccum recovered the Hawthorne Property, Judge Hart modified the damages award for that transaction to avoid another double recovery. However, he gave Niccum the cost of recovering the property as damages--$950,001 ($1,121,000 minus Meyer's payment of a first mortgage on that property in the amount of $170,999). Adding the debt to Engineering for $103,377, the new total came to $1,053,378.
 
 
 22
 However, the setoff issue remained. Unlike Judge James, Judge Hart found that Meyer didn't have the burden of showing a favorable apportionment based on Patton v. Carbondale Clinic, S.C., 161 Ill.2d 357, 204 Ill.Dec. 203, 641 N.E.2d 427, 433 (1994). Without any evidence of apportionment, Judge Hart concluded that the huge settlement with Seyfarth more than compensated Niccum for the $1,053,378 in damages he suffered from the Engineering and Hawthorne property transactions. This left Niccum with no additional monetary recovery, so he appealed.[3]
 
 
 23
 The first issue is whether Niccum transferred ownership of Engineering; by finding that he didn't, Judge Hart lopped off more than $14 million in potential damages, and this made the setoff issue dispositive of the whole case. The question of ownership is a pure question of fact, and because the judge tried the issue de novo after withdrawing it from the bankruptcy court, we review his decision only for clear error. In re Bonnet, 895 F.2d 1155, 1157 (7th Cir.1990).
 
 
 24
 In essence, Judge Hart found a breach of the stock purchase agreement by Niccum; that Niccum never parted with ownership of the company as the agreement required. This is analogous to a situation where Niccum and Meyer contract for the sale of Niccum's car, with Niccum never giving the car (or its title) to Meyer. In this situation, Niccum still owns the car, but Meyer may have a breach of contract claim.
 
 
 25
 Still, ownership of something as ethereal as a corporation is quite different from the ownership of something concrete, like a car. The objective evidence of a transfer of ownership of the stock of a company is the stock certificate(s). Although they aren't the shares themselves, they are prima facie evidence of ownership of the shares and, therefore, of the corporation. Head v. Wood, 20 Ill.App.2d 97, 155 N.E.2d 348, 351 (2d Dist.1959); 11 Fletcher Cyclopedia Corporations § 5092 (1995). The pledge agreement here, a key part of the deal, necessarily required Niccum to surrender his certificates so they could be held in escrow. As we said, Niccum never did so, keeping them tucked away in his vault. This is prima facie evidence that ownership of the shares remained with Niccum. In addition, the fact that the parties intended to pledge the stock certificates as security shows that they placed a high value on them, intending these certificates to signify ownership of the corporation.
 
 
 26
 Niccum tries to overcome this evidence by pointing to the conduct of the parties--he says that after Meyer acted as the owner of Engineering and he didn't stop him, how could he (Niccum) still be considered to be the owner? True, Meyer did take part in Engineering's business. He executed a lease between Engineering and Industries and pledged Engineering's assets to secure his loan from the bank. However, Niccum remained as president of the company, was still in charge of the day-to-day operations of Engineering, and controlled the right to vote the shares of the company. While Niccum's involvement thus far is explained by the contract, there was also evidence--Meyer's testimony, which Judge Hart apparently accepted--that Niccum continued to hold himself out as the owner of Engineering after the sale and continued to treat it as his own, even withdrawing money when he wanted to. And as a practical matter, if Niccum had actually transferred ownership to Meyer, his failure to take action to force Meyer to make his payments is inexplicable ($25,000 was due quarterly, so after the more than 2 years that Niccum laid back, more than $200,000 was due) and inconsistent with a transfer of ownership.
 
 
 27
 Besides, Niccum had several good reasons to go back on the deal and keep the company. While he signed the contract, he had shown reluctance, giving in only after years of "advice" from Meyer. And, at least according to Niccum, the purchase price for Engineering was woefully inadequate. Assuming that this deal wasn't a sham for tax avoidance purposes, inadequate consideration surely is a motivation to go back on the deal. Any reason Niccum may have had to renege on the deal was surely reinforced when, after the supposed sale, Meyer never paid a cent on the note.
 
 
 28
 So, the objective evidence is in equipoise--e.g., Niccum's retention of the stock certificates versus Meyer's management activities--and the logic on both sides is compelling. While we can't be sure what really happened here and who really owns Engineering, we are sure of one thing; that Judge Hart had a better opportunity to decide this issue than we do. As the trial judge he watched the witnesses and absorbed the testimony of the parties and their experts and reached a well-reasoned conclusion that Niccum retained ownership of Engineering. That conclusion passes our clear error review, and, with proof of no damages from the Engineering deal--besides the $103,377 debt Meyer owed to Engineering--we move on to the Hawthorne property transaction.
 
 
 29
 In addition to the costs of recovering the property, Niccum asks for rent for the period that Meyer possessed it as damages for the loss of use of that land. However, Engineering used this property the whole time. As Niccum owned Engineering throughout, his damages can't be for loss of use. Only if Niccum can establish that Engineering, his company, paid rent to Meyer for the fraudulently obtained land can he recover--otherwise he suffered no loss, for he got the value of the property by using it rent-free.
 
 
 30
 Niccum points to the fact that Meyer executed a lease between Engineering and Industries and, assuming the rent to be the $260,000 per year that Niccum claims--covering January 1, 1986, until October 23, 1995, that total comes to $2,995,000 when the interest is added in--we add that to the old total of $1,053,378 (the costs of recovering the property plus the debt Meyer owed to Engineering) and arrive at a new grand total of $4,048,378.
 
 
 31
 With this figure in mind, we now review whether Meyer can set off enough of the $12 million settlement with his old law firm to cancel it out. Illinois' Joint Tortfeasor Contribution Act, 740 Ill.Comp.Stat.Ann. 100/2(c), prevents plaintiffs from getting more than a single full compensatory recovery for an injury. Pasquale v.. Speed Prods. Eng'g, 166 Ill.2d 337, 211 Ill.Dec. 314, 654 N.E.2d 1365, 1381 (1995). So, after the fact finder assesses the total damage done and holds the defendant liable, the plaintiff's earlier recoveries for that same injury, but from other tortfeasors, become relevant. Id. at 1382. If these earlier recoveries truly compensate the plaintiff for the same injury, they can and will be used to offset the current damages award. Id. Unfortunately, Niccum's settlement with Seyfarth failed to apportion the $12 million settlement between the many claims he asserted. So, we are left with two questions: (1) whether the settlement compensated Niccum for the injuries he claims in the present suit, and (2) at what rate.
 
 
 32
 Judge Hart concluded that the settlement compensated Niccum for losses incurred in the Engineering and Hawthorne property frauds. We agree that it did. First, Niccum released all claims against Seyfarth for "Meyer's representation," and that necessarily included the claims in this suit. A settlement releasing a tortfeasor from liability for all of the plaintiff's injuries necessarily compensates each and every one. Patton, 204 Ill.Dec. 203, 641 N.E.2d at 433. Although the settlement exempted the recovery, in specie, of Engineering or the Hawthorne Property from the refund obligation, this provision doesn't allocate the money to all injuries except these two--it simply says that if Niccum recovered the company or the property, their value would not be counted in the refund calculation, not that damages related to those sales will be excluded. By requiring a refund of all damages, this provision actually strengthens our conviction that the Engineering and Hawthorne property injuries were compensated--after all, how could Seyfarth ask for any refund if Niccum's claims against Meyer have nothing in common with the claims settled in the arbitration proceeding? Besides, Niccum would surely not have left any of these claims out of the settlement when Seyfarth was solvent and Meyer was in bankruptcy.
 
 
 33
 So, the settlement with Seyfarth, as structured and as interpreted by Judge Hart, compensated Niccum for the injuries he claims here. Our final issue, therefore, is whether the settlement compensated Niccum at least $4,048,378.01 for these two injuries. If the settlement of a prior suit to which the current defendant was not a party provides compensation for the injuries in the current suit, in addition to other injuries, but doesn't allocate the money, the plaintiff bears the burden of proving allocation. Patton, 204 Ill.Dec. 203, 641 N.E.2d at 433 (citing Betts v. Manville Personal Injury Settlement Trust, 225 Ill.App.3d 882, 167 Ill.Dec. 1063, 588 N.E.2d 1193, 1205 (1992)). Cf. Pasquale, 211 Ill.Dec. 314, 654 N.E.2d at 1384 (placing the burden on the defendant to allocate because "[t]his was not a case like Patton where the defendant was not a party to the suit underlying the prior settlement."). If there is no proof of allocation, Patton allows the whole settlement to be set off. Id. at 434. Here, the sum Niccum demanded from Seyfarth for these two injuries, $14,459,078, exceeded the total settlement, so there is no impediment to setting off the whole amount, let alone slightly over $4 million. Besides, Niccum put on no evidence of allocation--and even if we went by percentages, the amount Niccum sought in arbitration for these injuries was more than 40 per cent of the total demand and the damages here are slightly more than 33 per cent of the $12 million dollar settlement.
 
 
 34
 For these reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The plaintiffs are Niccum, his wife Doris, and their company, Marvel Contaminant. For our purposes they can be treated as a single entity, "Niccum."
 
 
 [2]
 Actually the stock went to MEC Enterprises, Inc., and the stock of this company was held by Meyer's family trust, MEC Trust # 1. However, for our purposes, this entity and Meyer are the same and we will treat them as such
 
 
 [3]
 Meyer, acting pro se, has also cross-appealed and filed a separate appeal (98-2090), but his claims are either frivolous or waived, so they merit no attention