NOTICE
Decision filed 04/08/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220818

NO. 5-22-0818

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| DAVID J. FLETCHER, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Macon County. |
| | ) | |
| v. | ) | No. 11-L-64 |
| | ) | |
| EDWARD F. FLYNN and WINTERS, | ) | |
| FEATHERSTUN, GAUMER, POSTLEWAIT, | ) | |
| STOCKS & FLYNN, | ) | Honorable |
| | ) | James R. Glenn, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Moore and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1     The plaintiff, David J. Fletcher, brought a legal malpractice action against the defendants, Edward F. Flynn and Winters, Featherstun, Gaumer, Postlewait, Stocks & Flynn (collectively, Flynn), alleging that Flynn failed to provide proper legal advice and services in relation to the plaintiff's real estate development project in Macon County, Illinois. Following a trial, the jury returned a verdict in favor of Flynn. The trial court subsequently denied the plaintiff's motion for a judgment notwithstanding the verdict and the plaintiff appealed. On appeal, the plaintiff claims that the trial court erred in denying his motion for judgment notwithstanding the verdict because the evidence, when viewed in a light most favorable to Flynn, so overwhelming favored the plaintiff that no contrary verdict could ever stand. We affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3      The plaintiff filed a legal malpractice action against Flynn and his law firm on September 28, 2010.[1] In the second amended complaint, filed September 12, 2019,[2] the plaintiff alleged that he retained Flynn in November 2004 to provide legal advice and services in regard to a proposed homeowners' subdivision development in Mt. Zion, Illinois, and at the time of the engagement, Flynn knew the plaintiff had no experience in real estate development. The plaintiff further alleged that Flynn breached his duty of care to the plaintiff in, among other things, failing to advise the plaintiff to incorporate his real estate development project to limit his potential legal liability and failing to investigate and advise the plaintiff about the legal implications of a pipeline easement running through the property, including potential restrictions on subdividing and building on the property.[3] The plaintiff claimed that he sustained economic losses proximately caused by Flynn's negligence, including diminution in property value, costs to resurvey the property, lost opportunity costs, and legal fees to defend himself in a lawsuit by the development's homeowners' association. In his answer, Flynn denied the plaintiff's allegations of negligence. Flynn filed affirmative defenses, alleging plaintiff's contributory negligence, comparative negligence, failure to mitigate his damages, as well as negligence by nonparties.

¶ 4      The trial began September 19, 2022, and ended on September 27, 2022. During the seven-day trial, the jury heard testimony from the parties and their occurrence and expert witnesses, and

---

[1]The plaintiff's case was originally filed in Champaign County and subsequently transferred to Macon County pursuant to Flynn's *forum non conveniens* motion.
[2]The second amended complaint included a count alleging breach of oral contract (count II). The plaintiff dismissed the contract claim at the close of the proofs at trial, and the jury considered only the count for legal malpractice during deliberations.
[3]The plaintiff also alleged that Flynn failed to supervise an experienced associate attorney in his firm and failed to supervise the engineer who prepared and recorded a defective plat of the subdivision; however, those claims have not been raised in this appeal.

they viewed numerous documents. An overview of the evidence[4] pertinent to the two points on appeal follows.

¶ 5                                    A. *The Real Estate Development*

¶ 6     At the time of these events, the plaintiff was a licensed physician specializing in occupational medicine. In 1991, the plaintiff purchased 133 acres of a property that would become part of a real estate development called "Woodbine Park Prairie Estates" (Woodbine). The Woodbine property is situated between Fort Daniel Conservation Area and Spitler Woods Park in Macon County, Illinois. Prior to the purchase, the plaintiff did extensive research into the property. He learned that the property had a rich history and that it was a key environmental corridor with wetlands, lakes, and woodlands. Prior to the purchase, the plaintiff also obtained title insurance. The title policy disclosed the existence of a natural gas pipeline easement. At the time, the plaintiff was not concerned about the easement because he did not anticipate developing the property. The plaintiff reviewed the easement document and noted that the easement had been granted to Panhandle Illinois Pipeline Company (Panhandle) on December 17, 1930. He also noted that the easement document did not identify or define any restrictions. The plaintiff asked one of his former

---

[4]Although the trial transcript is voluminous, the plaintiff's statement of facts in his opening brief is a single page. The statement of facts contains a sparse summary of the plaintiff's allegations of negligence and the defendants' answer and affirmative defenses, and it identifies the dates of trial proceedings, the date on which the verdict it was returned, the date the plaintiff filed his motion for judgment notwithstanding the verdict, the date that motion was denied, and the date the notice of appeal was filed. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires the appellant to provide a cogent statement of the facts necessary to an understanding of the case, without argument and with appropriate references to the record on appeal. The plaintiff's statement of facts fails to acquaint this court with any factual background relative to the issue on appeal. The rules of procedure regarding appellate briefs are rules, not mere suggestions; and it is within the discretion of the reviewing court to strike a brief and dismiss the appeal for failure to comply with the applicable rules of appellate procedure. *Venturella v. Dreyfuss*, 2017 IL App (1st) 160565, ¶¶ 22-23. Nevertheless, the plaintiff's failure to comply with Rule 341(h)(6) does not preclude our review. The issues raised on appeal are defined and each party has included citations to the trial testimony and exhibits in support of their respective arguments. Accordingly, we will review the merits of the appeal, while cautioning plaintiff's counsel to comply with the rules of procedure in the future.

attorneys to do some research into the easement, but there is no testimony regarding the nature or result of that research.

¶ 7     Following the purchase of the initial tract in 1991, the plaintiff began to clear the property of abandoned cars and other debris. He also worked to restore the wetlands and reintroduce native plants and grasses on the property. In 2000, the plaintiff purchased the remainder of the Woodbine property. Over the next few years, the plaintiff continued the restoration work on the property.

¶ 8     Sometime in early 2003, the plaintiff began to explore the idea of developing the property into a residential community governed by a homeowners' association. He wanted to maintain the "environmental mission" of the property while obtaining a return on his investment. The plaintiff testified that he did not have any experience in real estate law or development and that he did not understand how the pipeline might affect his proposed development. Before obtaining legal counsel, the plaintiff contacted Panhandle to inquire about the pipeline easement and discuss his development plan.

¶ 9     In a letter dated March 31, 2003, Panhandle provided a written response to the plaintiff's inquiry (the Panhandle letter). Panhandle informed the plaintiff that it had an "open" easement and that it operated a 22-inch high-pressure natural gas pipeline across the northwest section of the property. Panhandle stated that the boundaries of its easement included a 50-foot-wide strip on each side of the pipeline and that no permanent structures could be erected or placed in the easement area. Forbidden structures included storm drains, catch basis, fire hydrants, sign boards, supports, brace poles, and telephone or power line poles. Panhandle also advised that any roads, driveways, and utilities must cross the pipeline at right angles, and that road crossings must have a minimum cover of 36" between the top of the pipeline and the bottom of the pavement. Proposed street intersections and cul-de-sac areas were to be located outside the easement area, and no trees

4

or shrubs could be placed on the easement. Panhandle required the proposed site plan to incorporate and accurately scale the location and depth of the pipeline and to include a warning regarding the location of the pipeline. Panhandle requested copies of the preliminary development plan and indicated that all planned construction or modifications to the construction design would require preapproval by Panhandle. Panhandle indicated that it would send representatives out to mark the location of the pipeline and the outer edges of the easement, and it provided contact information for its representatives. In addition, Panhandle enclosed four development-planning documents, entitled "General Requirements for Construction in the Vicinity of Panhandle's Pipeline or Easement," "Easement Restrictions and Requirements," "Right of Way Amended Requirements," and "How to Recognize and What to do about a Gas Leak."

¶ 10    In 2004, the plaintiff hired a local engineering company to perform a feasibility study on the project. The study was never completed because the company required the plaintiff to hire the company for the engineering work and to retain a real estate development attorney for the project.

¶ 11    In November 2004, the plaintiff retained Flynn to provide legal advice and services related to the Woodbine development. The plaintiff had an ongoing professional relationship with Flynn and his firm, and he was aware that Flynn had experience in real estate development. The plaintiff described himself as "a complete rookie," who had no experience in real estate development and who needed a lot of "handholding." He testified that he hired Flynn to handle "all aspects" of the real estate development. The legal work included taking all necessary actions to limit the plaintiff's personal liability related to his role as developer of the property, advising the plaintiff about any encroachments that could affect his ability to subdivide the property for sale to future homeowners, and preparing an owners' declaration document that set forth the rights and obligations of the developer and the homeowners. The plaintiff testified that "in his mind, as the client," he believed

5

the scope of representation was "all-encompassing" and "open ended" to ensure the project was successful. The plaintiff acknowledged that there was no written engagement letter or other document memorializing the agreed-upon representation.

¶ 12    In November 2004, the plaintiff also hired Phillip Cochran as a surveyor and engineer to analyze the property and determine what could be built on it given the existing flood plain and waterways. The plaintiff knew that Cochran and Flynn had worked together on several projects. He hired Cochran based upon Flynn's recommendation. The plaintiff testified that he notified Cochran about the pipeline easement and that Cochran indicated he would investigate it. The plaintiff also testified that he provided a copy of the Panhandle letter to Cochran and Flynn. At this time, the plaintiff was still considering whether to develop the Woodbine property or sell it as a whole. The plaintiff knew that the Woodbine development would require rezoning and approval from certain governmental agencies and that the project was not a "done deal."

¶ 13    In March 2005, Cochran prepared a preliminary development plan for the Woodbine property and sent it to the plaintiff. On April 25, 2004, the plaintiff sent an e-mail addressed to Cochran, with a copy to Flynn. In the e-mail, the plaintiff indicated that he reviewed the plan and had three "minor" concerns, only one of which involved the pipeline easement. The plaintiff's concern was that proposed lots 33 and 34 were adjacent to the easement and there was no driveway to access those lots from Fletcher Lane. Three weeks later, Cochran sent the plaintiff a revised plan reflecting a driveway that would provide access to lots 33 and 34 from Fletcher Lane. The plaintiff testified that he had several conversations with Cochran about the pipeline easement and that Cochran thought that the northwest corner lots could be developed and that a road could be constructed to provide access to those lots.

¶ 14    In June 2005, Cochran created a plat that included 43 individual lots along with a defined common area consisting of wetlands, lakes, walking trails, and a private road system. The common area was to be conveyed to and maintained by a soon-to-be formed homeowners' association. On June 30, 2005, Cochran presented the plaintiff's development plan to the Village of Long Creek and the plan was approved. In the meantime, Flynn had completed the original owners' declaration document. The plaintiff signed that document on August 3, 2005. The plat and the owners' declaration were recorded in Macon County that same day.

¶ 15    During the latter part of 2005, the plaintiff decided to develop the Woodbine property in two phases to limit his initial financial outlay for infrastructure costs. Phase I included the common areas depicted in the June 2005 plat and the property south of the common areas. It was subdivided into 32 lots. The pipeline did not interfere with the development of those lots. Phase II involved the acreage north of the common areas, identified as Lot 33. The long-term plan was to subdivide Lot 33 into eight smaller lots for sale to individual homeowners.

¶ 16    On September 23, 2006, the plaintiff sent an e-mail addressed to Flynn and Cochran. The plaintiff advised them that Phase I was nearly complete and that all of the infrastructure was in place. The plaintiff stated that he intended to proceed with Phase II and get the county board to approve the project. The plaintiff indicated that he needed Cochran's "input and work with the pipeline people" regarding "where and how to construct a private driveway for lots 33 to 35" on the northwest part of the property. The plaintiff testified that though he directed his inquiry to Cochran, he expected Flynn, as his attorney, to investigate and make sure the plaintiff could proceed.

¶ 17    Over the next few years, the Woodbine development was beset with problems. The newly formed Woodbine Park Prairie Estates Homeowners' Association (Woodbine HOA) and

7

individual homeowners objected to the lack of a legal description of the common areas in the owners' declaration, and the plaintiff agreed to several amendments to address those objections. At the plaintiff's direction, Flynn prepared amended versions of the owners' declaration. The Woodbine HOA also objected to the plaintiff's failure to convey the common areas in the time promised. In addition, material defects were identified in the plats prepared by Cochran. The plaintiff directed Cochran to complete a proper survey and legal description of the common area and to correct the defects so that the common area could be conveyed to the Woodbine HOA. In October 2008, Cochran provided a corrected plat and survey. The plaintiff then attempted to convey the common areas, but the Woodbine HOA refused to accept the conveyance.

¶ 18    On October 13, 2008, the plaintiff terminated Flynn's services on the Woodbine development. Thereafter, the plaintiff became involved in additional litigation regarding the development. In October 2009, the Woodbine HOA filed a lawsuit against the plaintiff. The suit alleged that the plaintiff failed to deliver the common area in a timely fashion and that he failed to meet Illinois Department of Transportation specifications for the design and construction of the roads, bridges, and culverts in the development. The plaintiff brought an action against individual members of the Woodbine HOA. The plaintiff also filed a lawsuit against Cochran and ultimately settled the case for $550,000.

¶ 19                            B. *The Litigation Against Flynn*

¶ 20    In September 2010, the plaintiff filed this legal malpractice action against Flynn. As noted earlier, the plaintiff alleged that Flynn failed to advise him to incorporate the Woodbine development and failed to investigate and advise him about the effect of the pipeline easement on the Woodbine development. During his testimony, the plaintiff stated that he did not have any discussions with Flynn about whether the Woodbine development should be placed under a

8

corporate entity. The plaintiff testified that he did not know about the potential pitfalls of real estate development, and he did not realize the extent of the risk to himself as an individual. The plaintiff admitted, however, that he was aware that there had been a drowning accident in one of the lakes prior to his purchase of the property and that he had concerns about that type of liability. The plaintiff also admitted that he was aware of the option of incorporating a business, having created limited liability companies for businesses in December 2002 and January 2004. He also acknowledged that he had incorporated his medical practice into a limited liability company in January 2005, based upon the advice of an attorney. The plaintiff explained that as a "stand-alone" practitioner, he had a lot of risks. He sought to limit his risks as a medical provider and as an employer.

¶ 21 The plaintiff testified that he had several conversations with Flynn about the pipeline easement. The plaintiff stated that he asked Flynn to investigate the easement and advise him of any restrictions. He testified that he documented his requests, and he referred to the e-mail dated April 25, 2004, and the e-mail dated September 23, 2006, as evidence of his request. The plaintiff "believed" he provided a copy of the Panhandle letter to Flynn. He could not recall when he provided the letter to Flynn, and he could not recall having any conversations about its contents. The plaintiff described the pipeline easement as a "major" issue. He was concerned about street access to the most desirable part of property—the northwest corner lots of the Woodbine property. The plaintiff claimed that Flynn indicated that he would investigate the matter, and that Flynn never looked into the restrictions on development and whether it would be feasible to build a road over the easement.

¶ 22 During cross-examination, the plaintiff admitted that he knew of the existence of the pipeline and the easement before he retained Flynn. Based upon his correspondence with

Panhandle, the plaintiff knew that he could not build on the pipeline easement, including 50 feet on either side of the pipeline. The plaintiff admitted that the pipeline easement was not the only issue affecting the development of Phase II. He acknowledged that the land was partially on a floodplain and that a bridge that provided access to the lots in Phase II had washed out.

¶ 23    The plaintiff blamed both Flynn and Cochran for failing to investigate the pipeline easement in connection with the Phase II development.

> "I placed the blame on both gentlemen. They didn't investigate the easement. They never got a title policy. They never had communication with the Pipeline. They never got any permission to put the road that they have on the preliminary plat and the final plat that was approved by the Village of Long Creek to be able to do that. They didn't get any of the documents. They didn't challenge what the significance of the easement was. I know what the Pipeline says, but you hire professionals to interpret that and represent you and that's what I did."

¶ 24    Flynn was called as an adverse witness in the plaintiff's case, and he also testified in his own defense. Flynn stated that he was hired to perform specific tasks. He identified those tasks as applying for rezoning of the property, preparing the owners' declaration and later revisions of the document, and forming a homeowners' association. He also assisted the plaintiff with the sale of a few lots. Flynn testified that he knew of the pipeline easement. Flynn also testified that the plaintiff never gave him a copy of the Panhandle letter and never asked him to contact Panhandle or investigate the pipeline easement.

¶ 25    Flynn also addressed the claim that he failed to recommend incorporation of the Woodbine development. Flynn testified that sometime between November 2004 and March 2005, he told the plaintiff that he did not think the Woodbine development was a good and prudent business for the

10

plaintiff. Flynn suggested that the plaintiff partner with a professional real estate developer or sell the entire property to a reputable developer. During a subsequent meeting, the plaintiff informed Flynn that he intended to proceed as the sole developer. At that point, Flynn advised the plaintiff that he needed to consider whether to incorporate. Flynn testified that he discussed the pros and cons of incorporation with the plaintiff. He explained why some developers decide to incorporate while others do not. Flynn advised the plaintiff to think about it and to let him know what the plaintiff decided. Flynn was asked whether he committed legal malpractice in his representation of the plaintiff on the Woodbine project. Flynn declined to offer an opinion. He explained that he had answered the questions regarding the facts of what had occurred, that he was not testifying as an expert, and that the ultimate determination was for the jury.

¶ 26    Cochran testified that he was the engineer and the surveyor for the Woodbine project. In that position, Cochran was responsible for preparing a development plan, the plats, and the "metes and bounds" legal description of the property. Cochran testified that during a walk around Woodbine in 2004, he informed the plaintiff that there could be restrictions on building structures near the pipeline. Cochran testified that questions regarding restrictions on building around an easement are for an engineer, not a lawyer. Cochran testified that the plaintiff never gave him a copy of the Panhandle letter. Cochran acknowledged that he had been sued in relation to his work on the project and that he settled the case for $550,000.

¶ 27    Thomas Overmyer was the plaintiff's expert in civil engineering. Overmyer testified that he was initially hired to do some work on the Woodbine development in 2016 and that he was later retained as an expert witness for the lawsuit. When he was originally hired to work on the Woodbine project, one of his first tasks was to obtain title work. Overmyer acknowledged that at the time he was hired, the plaintiff did not provide him with a copy of the Panhandle letter.

11

Overmyer recalled receiving a copy of the letter a few years after he was hired for the project. In his capacity as an engineering expert, Overmyer testified that surveyors prepare plats and locate easements that might affect property developments, that surveyors and engineers prepare legal descriptions for property, and that engineers determine the "buildability" of property. He reviewed the plat that Cochran prepared in 2005 and opined that the plat did not correctly depict the pipeline easement. He further opined that three of the lots in Phase II of the development were not buildable due to the pipeline easement and the topography of the land. Overmyer also testified about the real estate development lawyer's responsibilities as compared to engineers and surveyors. Overmyer acknowledged that he was not a lawyer and that he did not know what the "standard of care" was for Illinois lawyers.

¶ 28     Kevin Luebchow testified as the plaintiff's legal expert. Luebchow testified that he is a licensed attorney in Illinois. He has a "transactional practice," primarily focused focusing on real estate transactions and estate planning. Luebchow reviewed the depositions of the parties and other witnesses, the pleadings, Flynn's billing records, and the documents related to the Woodbine development. Luebchow testified that he did not find any documents indicating that Flynn advised the plaintiff to incorporate. He opined that Flynn's failure to advise the plaintiff to incorporate the Woodbine development was a breach of the standard of care for a practicing attorney in Illinois. Luebchow testified that this was a "prime case" for setting up a limited liability company because the development involved several lots, the client was required to make a significant financial outlay for infrastructure, the client was not a professional developer, and the client had significant assets outside of the real estate venture. Luebchow also testified that a real estate attorney has a duty to investigate an easement that could restrict development and that Flynn's failure to do so was a breach of the standard of care. Luebchow testified that a real estate attorney had the responsibility

12

to advise the developer as to what restrictions are created by the easement and that the surveyor or engineer has the responsibility to tell the developer whether there is enough room to build.

¶ 29    During cross-examination, Luebchow admitted that this was the first time he had testified as an expert in a legal malpractice case. Luebchow acknowledged that he was not present at the meeting between the plaintiff and Flynn and that he did not know what Flynn said to the plaintiff in regard to incorporation. Luebchow agreed that the plaintiff knew about the Panhandle pipeline easement and that he had some knowledge about the building restrictions on the easement prior to retaining Flynn.

¶ 30    The plaintiff presented short excerpts from the testimony of Flynn's withdrawn legal expert witness, Michael Firsel. In one excerpt, Firsel testified that he "generally" agreed with the proposition that it would be prudent for a person who derives their main source of income from a field unrelated to real estate development to create a corporation or LLC for the purpose of developing real estate. In another excerpt in which he responded to a hypothetical question, Firsel testified that he would have explained the benefits and detriments of incorporation to a client such as the plaintiff and then recommended that the client protect himself with some sort of corporate entity. In a third excerpt, Firsel testified that in matters of incorporation, the lawyer has "a duty to the client to explain the various options available to the client and the ramifications of making decisions on each of those various options, and that the question of whether to incorporate is a decision for the client to make.

¶ 31    On September 27, 2022, following seven days of testimony, the jury returned a verdict in favor of Flynn. Subsequently, the plaintiff filed a posttrial motion for a judgment notwithstanding the verdict. The plaintiff asked the trial court to enter a judgment in his favor as to liability and

order a new trial on damages. The trial court denied the plaintiff's motion, and this appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, the plaintiff contends that the trial court erred in denying his posttrial motion for a judgment notwithstanding the verdict. The plaintiff claims that he was entitled to a judgment notwithstanding the verdict because he presented unrefuted evidence that Flynn failed to investigate and advise him of the legal implications of a pipeline easement running through the property, including potential restrictions on development, and failed to advise him to incorporate his real estate development project into a corporate entity to limit potential legal liability. As for relief, the plaintiff asks this court to set aside the judgment on the jury's verdict, enter a judgment for the plaintiff on liability, and remand the case for a new trial on damages.

¶ 34    In analyzing this issue, we are reminded of the differing responsibilities of the jury, the trial court, and the appellate court. The jury has the responsibility to resolve conflicts in the evidence, to assess the credibility of the witnesses, and to decide what weight should be given to the testimony. *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). The trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions or because the court feels that another result is more reasonable. *Maple*, 151 Ill. 2d at 452. Similarly, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from evidence that did not greatly preponderate either way. *Maple*, 151 Ill. 2d at 452-53.

¶ 35    Here, the plaintiff is appealing the denial of his motion for judgment notwithstanding the verdict. It is important to note that the standards related to a motion for a new trial and a motion for judgment notwithstanding the verdict are distinct. See *Pedrick v. Peoria & Eastern R.R. Co.*,

14

37 Ill. 2d 494, 509-10 (1967). In ruling on a motion for a new trial, the court weighs the evidence and may set aside a verdict and order a new trial if the verdict is against the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. The court's ruling on a motion for new trial is reviewed under the abuse-of-discretion standard. *Maple*, 151 Ill. 2d at 455.

¶ 36 In contrast, a motion for judgment notwithstanding the verdict presents a question of law as to whether, when all of the evidence and reasonable inferences therefrom are considered in a light most favorable to the nonmovant, there is a total failure or lack of evidence to prove any necessary element of a party's case or defense. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. In ruling on a motion for a judgment notwithstanding the verdict, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. *Maple*, 151 Ill. 2d at 453.

¶ 37 A judgment notwithstanding the verdict should be granted only where all of the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick*, 37 Ill. 2d at 510. The standard for entering a judgment notwithstanding the verdict is a high one, and its entry is not appropriate if reasonable minds can differ as to the inferences or conclusions to be drawn from the evidence. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 34; *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995). A judgment notwithstanding the verdict is not proper "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454. A judgment notwithstanding the verdict should not be entered merely because a verdict is

15

against the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 453. A ruling on a judgment notwithstanding the verdict is reviewed *de novo*. *Steed*, 2021 IL 125150, ¶ 34.

¶ 38     To prevail on a claim for legal malpractice, a plaintiff must plead and prove the existence of an attorney-client relationship that establishes a duty on the part of the attorney, a negligent act or omission constituting a breach of that duty, proximate cause, and actual damages. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). The injury resulting from legal malpractice is not a personal injury, but rather a pecuniary injury to an intangible property interest caused by the lawyer's negligence. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306; *Eastman v. Messner*, 188 Ill. 2d 404, 411 (1999). That an attorney may have breached a duty of care is not, in itself, sufficient to sustain the client's cause of action, and therefore the client must demonstrate that the attorney's negligence proximately caused actual damages to the client. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306-07.

¶ 39     In this case, the plaintiff initially claims that he is entitled to a judgment notwithstanding the verdict because he presented unrefuted evidence that Flynn failed to advise him to incorporate his real estate development project into a corporate entity to limit potential legal liability. Flynn claims that there was conflicting testimony on this matter.

¶ 40     During the trial, Flynn testified that he spoke with the plaintiff sometime between November 2004 and March 2005, and he told the plaintiff that he did not think the Woodbine development was a good and prudent business for the plaintiff. Flynn suggested that the plaintiff partner with a professional real estate developer or sell the entire property to a reputable developer. When the plaintiff notified Flynn of his intention to proceed with the development, Flynn advised the plaintiff to consider whether to incorporate the project. Flynn testified that he discussed the pros and cons of incorporation and explained that some developers create corporations and others

16

do not. Flynn advised the plaintiff to think about it and let him know what the plaintiff decided. The plaintiff denied that this conversation occurred. The plaintiff, however, did not deny being aware of the risks of operating a business, such as a medical practice, and the risks he faced as a practitioner and as an employer. The plaintiff acknowledged that he incorporated his own medical practice. He also recognized some risks of liability attendant to the Woodbine property, such as accidental drownings in the lakes and waterways. The plaintiff's legal expert opinion, Kevin Luebchow, opined that Flynn should have recommended that the plaintiff incorporate and that his failure to so do constituted legal malpractice. Luebchow acknowledged he was not present for the conversations between the plaintiff and Flynn and did not know what Flynn told the plaintiff.

¶ 41 A review of the record reveals conflicting testimony regarding Flynn's advice as to incorporation. The jury was required to decide whether the plaintiff or Flynn was more credible on this point. The jury was also required to assess the credibility of plaintiff's expert witness. Based upon the trial testimony, a reasonable jury could have found that Flynn met the applicable standard of care when he initially advised the plaintiff to partner with or sell to a qualified professional developer, and subsequently advised the plaintiff to consider whether to incorporate the development, and that the plaintiff ignored Flynn's legal advice. Alternatively, the jury may have concluded that the plaintiff was more than 50% contributorily negligent in failing to follow Flynn's advice.

¶ 42 The plaintiff also claims that he is entitled to a judgment notwithstanding the verdict because he presented unrefuted evidence that Flynn failed to investigate and advise him of the legal implications of the pipeline easement. The plaintiff testified that he asked both Cochran, as the engineer, and Flynn, as legal counsel, to investigate and advise him about the impact of the pipeline easement on the development, and he produced two e-mails to support his testimony. In

17

those e-mails, the plaintiff made specific requests to Cochran, asking him to investigate the pipeline easement and to contact Panhandle about its easement. Flynn testified that the plaintiff never asked him to investigate the pipeline. Additionally, there was evidence that the plaintiff had contacted Panhandle in 2003, and Panhandle provided information as to the boundaries of the easement and various restrictions regarding placement of structures and roads on the easement. There was also evidence that the plaintiff did not provide the Panhandle letter to Flynn or Cochran or otherwise inform them of its contents. Cochran admitted that he, as the engineer, was responsible for determining how the easement impacted buildability of the lots at issue, and the plaintiff's engineering expert agreed.

¶ 43    Again, the jury was tasked with making credibility determinations and resolving conflicts in the testimony, and it could have found that Flynn's testimony was more credible than the plaintiff's testimony. Based upon the evidence, a reasonable jury could have found that the plaintiff had conducted his own independent research into the pipeline easement and learned about the building restrictions attendant to the pipeline before he retained Flynn. The jury could have concluded that the plaintiff did not ask Flynn to conduct further research into the pipeline easement. Additionally, the jury could have found that Cochran, not Flynn, was responsible for providing the plaintiff additional information related to the "buildability" of lots touching the easement. Based upon this testimony, the jury could have reasonably concluded that the plaintiff failed to prove that Flynn breached the standard of care in regard to providing legal advice about the easement. There was also evidence that other factors impacted the development of the lots near the pipeline easement, including the inadequacy of the roads and bridges and the fact that one part of a lot was in a floodplain. As a result, the jury could have concluded that the plaintiff's alleged damages resulted from the negligence of others.

18

¶ 44                          III. CONCLUSION

¶ 45    After reviewing the record, and viewing all of the evidence in a light most favorable to Flynn, we cannot say that the evidence so overwhelmingly favored the plaintiff that no contrary verdict could ever stand. Therefore, we find the trial court did not err in denying the plaintiff's motion for a judgment notwithstanding the verdict. Accordingly, the judgment is affirmed.

¶ 46    Affirmed.

*Fletcher v. Flynn*, 2024 IL App (5th) 220818

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, No. 11-L-64; the Hon. James R. Glenn, Judge, presiding. |
| **Attorneys for Appellant:** | Michael T. Franz, of Lewis Brisbois Bisgaard &Smith LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel B. Meyer and Edward C. Eberspacher IV, of Meyer Law Group LLC, of Chicago, for appellees. |